```
 1                 UNITED STATES DISTRICT COURT
                   MIDDLE DISTRICT OF FLORIDA
 2                      ORLANDO DIVISION
              CASE NO. 6:14-cv-149-Orl-18GJK
 3

 4    DEBRA MONSERRATE, et al.,

 5         Plaintiffs,

 6    vs.

 7    HARTFORD FIRE INSURANCE COMPANY,

 8         Defendant.

 9    _____/

10

11            DEPOSITION OF ANTOINETTE ELKINS
                Taken on Behalf of Defendant
12
                 Wednesday, February 25, 2015
13                  9:00 a.m. to 10:15 a.m.

14

15                    Jackson Lewis, P.C.
             390 North Orange Avenue, Suite 1285
16                  Orlando, Florida 32801

17

18

19

20

21

22    Reported By:

23    Carolyn M. Oglesby, Court Reporter
      Esquire Deposition Solutions
24    Orlando Office Job #274074
      Phone - 407.426.7676
25
```



ANTOINETTE ELKINS                                    February 25, 2015
MONSERRATE vs. HARTFORD FIRE INSURANCE                              2

```
1    APPEARANCES:

2        On Behalf of the Plaintiffs:
         DAVID BARSZCZ, ESQUIRE
3        LYTLE & BARSZCZ, P.A.
         543 North Wymore Road, Suite 109
4        Maitland, Florida 32751

5        On Behalf of the Defendant:
         DONALD C. WORKS, III, ESQUIRE
6        JACKSON LEWIS, P.C.
         390 North Orange Avenue, Suite 1285
7        Orlando, Florida 32801

8        ALSO PRESENT:
         RON FLEMING, VIDEOGRAPHER
9        ESQUIRE DEPOSITION SOLUTIONS
         200 East Robinson Street, Suite 725
10       Orlando, Florida 32801

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



Case 6:14-cv-00149-RBD-GJK  Document 121-2  Filed 04/17/15  Page 3 of 66 PageID 699

ANTOINETTE ELKINS                                     February 25, 2015
MONSERRATE vs. HARTFORD FIRE INSURANCE                          3

```
 1                         I N D E X

 2    WITNESS:                                      PAGE

 3    ANTOINETTE ELKINS

 4    By Mr. Works, Direct Examination                5

 5    By Mr. Barszcz, Cross-Examination              54

 6    By Mr. Works, Redirect Examination             58

 7    By Mr. Barszcz, Recross-Examination            58

 8    By Mr. Works, Further Redirect Examination     59

 9    By Mr. Barszcz, Further Recross-Examination    60

10    Certificate of Oath                            62

11    Certificate of Reporter                        63

12    Errata                                         64

13

14                E X H I B I T S   M A R K E D

15    Number

16      1       Answers to Interrogatories           40

17      2       Attendance Reports                   50

18      3       Second Amended Complaint             51

19      4       Consent to Sue                       53

20

21

22

23

24

25
```



Case 6:14-cv-00149-RBD-GJK   Document 121-2   Filed 04/17/15   Page 4 of 66 PageID 700

ANTOINETTE ELKINS                                    February 25, 2015
MONSERRATE vs. HARTFORD FIRE INSURANCE                           4

1              Deposition taken before Carolyn M. Oglesby,

2     Court Reporter and Notary Public in and for the State of

3     Florida at Large, in the above cause.

4              THE VIDEOGRAPHER: this is Tape Number 1, the

5          videotaped deposition of Antoinette Elkins being

6          taken in the matter of Debra Monserrate vs.

7          Hartford Fire Insurance Company being heard before

8          the U.S. District Court of Florida.  This

9          deposition is being held in Orlando, Florida.

10             Today's date is February 25, 2015.  The time

11         is 9:05 a.m.  My name is Ron Fleming and I am the

12         videographer for Esquire Deposition Solutions.  The

13         court reporter is Carolyn Oglesby.

14             Counsel, would you please introduce yourselves

15         for the record, please?

16             MR. BARSZCZ:  David Barszcz of Lytle Barszcz

17         for the plaintiffs.

18             MR. WORKS:  Don Works with Jackson Lewis on

19         behalf of the defendant.

20             THE VIDEOGRAPHER:  Thank you and would the

21         court reporter please swear in the witness?

22    WHEREUPON:

23    having been first duly sworn or affirmed, was examined

24    and testified as follows:

25                   DIRECT EXAMINATION:



1  BY MR. WORKS:

2      Q.   Ms. Elkins, would you please state your full

3  name?

4      A.   Antoinette Marie Elkins.

5      Q.   As you heard, my name is Don Works.  We are

6  here for purposes of taking your deposition today in

7  connection with a lawsuit that you and others have

8  brought against The Hartford.  Have you ever had your

9  deposition taken before?

10      A.   No.

11      Q.   Okay.  As I am sure your counsel has told you,

12  it is really not a complicated process.  I just wanted

13  to ask you a series of questions and all we ask is that

14  you answer truthfully and to the best of your ability.

15  Do you understand?

16      A.   I do.

17      Q.   Before we get started, I would like to give

18  you a few basic instructions that I think will help us

19  this morning.

20      A.   Okay.

21      Q.   The first one is please remember that you are

22  under oath and sworn to tell the truth.  Do you

23  understand?

24      A.   Yes.

25      Q.   If you don't hear a question, please ask me to



 1   speak up and I will be happy to do so.  If you don't

 2   understand a question, please tell me you don't

 3   understand it and I will be happy to try to rephrase it.

 4       A.   Okay.

 5       Q.   And if you don't know the answer to the

 6   question or don't remember information necessary to

 7   answer a question, just tell us you don't know or you

 8   don't remember.  Okay?

 9       A.   Okay.

10       Q.   I am sure your counsel doesn't want you

11   guessing or speculating nor would we.  We are just

12   trying to get at what the actual facts are in the case.

13   Okay?

14       A.   Okay.

15       Q.   And if you answer a question, we will assume

16   that you have heard it and you understood it and that

17   you answered truthfully and to best of your ability.  Is

18   that fair?

19       A.   Yes.

20       Q.   Please be sure to answer all questions audibly

21   so that the reporter can take down the answers.  The

22   videographer will be able to pick up a nod of the head,

23   obviously on the videotape, but that doesn't translate

24   too well on paper.  So if you will answer audibly, that

25   would be helpful.



Case 6:14-cv-00149-RBD-GJK   Document 121-2   Filed 04/17/15   Page 7 of 66 PageID 703

ANTOINETTE ELKINS                                    February 25, 2015
MONSERRATE vs. HARTFORD FIRE INSURANCE                        7

1       A.    Okay.

2       Q.    The other thing that I will remind you of is

3   the use of uh-huh or huh-uh.  Those don't translate

4   well, either, so if you could just simply say yes or no,

5   that would be great.

6       A.    Okay.

7       Q.    And then during the course of normal

8   conversation, it is not unusual for somebody to be

9   asking a question and the person hearing the question

10  understands where they are going with it and begin to

11  answer before they finish the question.  That is just

12  normal, but while it works well in normal conversation,

13  it doesn't work well in depositions because the reporter

14  can't take us both down at the same time.  So if you

15  will let me finish my questions before you answer, that

16  will be real helpful.  Okay?

17      A.    Okay.

18      Q.    Are you taking any drugs or other medications

19  that would affect your ability to recall past events?

20      A.    No.

21      Q.    Are you under the influence of alcohol or any

22  other substance that may affect your ability to recall

23  events?

24      A.    No.

25      Q.    Are you suffering from any medical condition



Case 6:14-cv-00149-RBD-GJK   Document 121-2   Filed 04/17/15   Page 8 of 66 PageID 704

ANTOINETTE ELKINS                                    February 25, 2015
MONSERRATE vs. HARTFORD FIRE INSURANCE                          8

1   that would affect your ability to testify today?

2        A.   No.

3        Q.   Other than your lawyers, have you spoken with

4   anybody to prepare for the deposition?

5        A.   No.

6        Q.   Have you spoken with any of the other

7   plaintiffs about their depositions?

8        A.   No.

9        Q.   And did you review any documents to prepare

10  for the deposition?

11       A.   Yes.

12       Q.   What did you review?

13       A.   I looked at my interrogatories.

14       Q.   Okay.

15       A.   I looked at my pay statements, some letters

16  that I had that said when I started.  That is probably

17  about it.

18       Q.   Okay.  And what is your current address?

19       A.   1587 Silktree Circle, Sanford, Florida.

20       Q.   How long have you lived there?

21       A.   Fourteen and a half years.

22       Q.   And since 2011, has anyone lived there with

23  you.

24       A.   My husband.

25       Q.   And his name?



Case 6:14-cv-00149-RBD-GJK   Document 121-2   Filed 04/17/15   Page 9 of 66 PageID 705

ANTOINETTE ELKINS                                    February 25, 2015
MONSERRATE vs. HARTFORD FIRE INSURANCE                          9

 1        A.    Steven Elkins.

 2        Q.    And from 2011 to date, has anybody lived at

 3   that address with you other than your husband, Steven?

 4        A.    No.

 5        Q.    Did you go to high school?

 6        A.    Yes.

 7        Q.    Where did you go?

 8        A.    Weymouth North High School.

 9        Q.    Where is that located?

10        A.    Weymouth, Massachusetts.

11        Q.    Did you graduate?

12        A.    I did.

13        Q.    And did you attend college?

14        A.    Yes, I did.

15        Q.    Where did you go to college?

16        A.    Valencia Community College and the University

17   of Phoenix.

18        Q.    Did you obtain a degree?

19        A.    Yes, I did.

20        Q.    And what is your degree in?

21        A.    Bachelor's of business management.

22        Q.    And when did you obtain that degree?

23        A.    1999, I believe.

24        Q.    And other than your formal education at

25   Valencia and the University of Phoenix, have you had any



 1    other formal education or training?

 2         A.    No.

 3         Q.    Do you hold any certificates or licenses?

 4         A.    No.

 5         Q.    When were you first hired by The Hartford?

 6         A.    By The Hartford or by CNA?

 7         Q.    By The Hartford.

 8         A.    I don't know the date.  I was hired by CNA in

 9    1999.

10         Q.    Okay.

11         A.    The Hartford purchased CNA.  I don't remember

12    the date.

13         Q.    Was that sometime in the late 2000s, like 2008

14    or 2009 or do you remember?

15         A.    No.  I think it was earlier than that.

16         Q.    Okay.  And at the time that The Hartford

17    purchased CNA and you became a Hartford employee, what

18    was your job?

19         A.    I was a claims examiner.  The title, I don't

20    remember what it was back then.

21         Q.    And at the time The Hartford acquired CNA and

22    you became a Hartford employee, were you paid a salary?

23         A.    Yes.

24         Q.    And throughout your employment with The

25    Hartford, were you paid a salary?



1      A.   Yes.

2      Q.   And was that an annual salary?

3      A.   It was quoted to us as an annual divided by

4  the number of weeks.

5      Q.   Okay.  Did you understand that your salary was

6  intended to compensate you for the hours that you would

7  work, no matter how many or how few?

8      A.   Yes.

9      Q.   And I understand you worked with The Hartford

10  through September 2014, correct?

11      A.   Yes.  My termination date was October 1, 2014.

12      Q.   Okay.  So you worked throughout the month of

13  September?

14      A.   Yes, I did.

15      Q.   And did you resign at that time?

16      A.   Yes, I did.

17      Q.   And since your resignation, you have not

18  performed any work for The Hartford, correct?

19      A.   Correct.

20      Q.   In 2011 and 2012, was your position with the

21  company LTD claims analyst 3?

22      A.   Probably. I don't remember.  It changed so

23  many times.  That is possible.

24      Q.   Okay.

25      A.   I don't remember exactly what it was at what



1   time.

2        Q.    At the time that you resigned your employment,

3   what was your title?

4        A.    Senior claims ability analyst.

5        Q.    Okay.  And prior to the time that you held

6   that job, do you recall what your title was?

7        A.    I think I was an ability analyst 3 at one

8   point.

9        Q.    Okay.

10        A.    I was a claims examiner 4 at one point.  They

11   changed --

12        Q.    Okay.

13        A.    -- a lot.

14        Q.    Okay.  So from 2011 through 2014, do you

15   recall that your positions were claims analyst 3,

16   perhaps, a 4?

17        A.    Perhaps a 4.  I was a 5 for a very short time.

18        Q.    And then a senior ability analyst?

19        A.    That was the most recent.

20        Q.    During what period of time did you hold the

21   senior ability analyst title?

22        A.    From the last time they changed the titles

23   until the day that I left.

24        Q.    Do you know when that was?

25        A.    No, I don't remember.



1     Q.   And do you recall what your salary was in

2  2011?

3     A.   $59,000-something.

4     Q.   And 2012?

5     A.   It did not change.

6     Q.   So from 2011 through 2014, your salary was

7  $59,000-something?

8     A.   It did not change.

9     Q.   Okay.  You don't recall exactly what it was,

10  but approximately $59,000 annually?

11     A.   Yes.

12     Q.   And does LTD stand for long-term disability?

13     A.   Yes, it does.

14     Q.   As an LTD claims examiner 3, 4 or 5, was your

15  work office work?

16     A.   Yes.

17     Q.   And did it relate to persons who were insured

18  by The Hartford?

19     A.   Yes.

20     Q.   And when you would receive a claim, what was

21  the first thing that you would do?

22     A.   I would have to set it up in the system, send

23  out a letter acknowledging that I received it and then

24  contact the claimant.

25     Q.   Did you review the insurance policy that the



Case 6:14-cv-00149-RBD-GJK  Document 121-2  Filed 04/17/15  Page 14 of 66 PageID 710

ANTOINETTE ELKINS                                    February 25, 2015
MONSERRATE vs. HARTFORD FIRE INSURANCE                              14

1  claim was made under?

2       A.    Yes.

3       Q.    And as part of that review, what were you

4  looking for?

5       A.    Elimination periods, waiting periods,

6  definition disability, what the maximum periods were, if

7  there were any exclusions, any limitations, any special

8  provisions.

9       Q.    Okay.  So you would take a look at the policy

10  for those purposes to determine those things?

11       A.    Yes.

12       Q.    And you would set up the claim in the system?

13       A.    Yes.

14       Q.    Send a letter to whom, the claimant?

15       A.    Yes.

16       Q.    And then you would schedule an interview with

17  the claimant?

18       A.    Call them and if we couldn't get them or if it

19  was more convenient, schedule an appointment, yes.

20       Q.    Before the call to the claimant, did you

21  review any documents other than the policy itself?

22       A.    Yes.  I reviewed whatever came in with the

23  claim.

24       Q.    And what would ordinarily come to you with the

25  claim?



1      A.   Claimant's statement.  It was called an income

2   benefits questionnaire.  There was an authorization and

3   there should have been an attending physician's

4   statement and sometimes there would be medical.

5      Q.   Okay.  And did the claims come to you from the

6   STD department?

7      A.   Sometimes.

8      Q.   And when they would come to you from the STD

9   department, were they moving into an LTD situation?

10     A.   There was potential for that, yes.

11     Q.   Okay.  When you would contact the insured,

12  what was the purpose of that call?

13     A.   To inform them that we had the claim, to

14  discuss the provisions of the policy and what they were

15  eligible for and to obtain additional information in

16  regards to their medical condition and their job, their

17  activities.

18     Q.   And was there a script for that call?

19     A.   None provided by The Hartford.  I had created

20  my own.

21     Q.   And would what you would ask each claimant

22  vary from claim to claim just as their conditions would

23  vary?

24     A.   Absolutely.

25     Q.   So you would have to tailor your interview to



1    the particular claim?

2         A.    That is correct.

3         Q.    And after you would interview the claimant,

4    what was the next thing you would do?

5         A.    Well, because I couldn't type and talk, I

6    would have to put that information into the computer.

7         Q.    Okay.  And then after entering that

8    information into the computer, what did you do?

9         A.    Make any request for medical records or

10   additional information that we needed to proceed.

11        Q.    How did you go about determining what type of

12   medical records would be necessary at that point?

13        A.    We would go by what the claimant told us or

14   his or her treating physicians and then based on when

15   they went out, we would request the records a couple of

16   months prior to get a full picture of what had happened

17   in their medical history.

18        Q.    How did you determine which healthcare

19   providers to reach out to?

20        A.    Based on what the claimant told us.

21        Q.    Okay.  So if the claimant told you that they

22   saw an orthodontist and a podiatrist and they had a

23   general physician and a cardiologist and their

24   disability related to their heart and that they recently

25   had surgery, would you reach out to all the physician or



1  did you make a determination as to the others that he or

2  she mentioned would not be necessary?

3      A.   If it was someone they hadn't seen recently,

4  then we wouldn't reach out to them.  If it was something

5  completely unrelated as in your example of the

6  orthodontist, we would not reach out to them.

7      Q.   Okay.  So you had to evaluate which medical

8  providers to reach out to?

9      A.   Which ones were appropriate, yes.

10     Q.   And then what information to request from

11 them?

12     A.   We pretty much standardized requesting medical

13 records which would include diagnostic testing,

14 operative reports, if applicable, and laboratory

15 testing.

16     Q.   Okay.  Were there form letters for the request

17 for medical information?

18     A.   Yes, they were.

19     Q.   And did you tailor those letters to the

20 particular claim?

21     A.   Yes, we did.  We would input the dates.  We

22 certainly wouldn't ask for an operative report from a

23 family physician.  So we would take that out.

24     Q.   So you would have to fine-tune the letter to

25 where it was appropriate for the claimant.  Is that



1   fair?

2       A.   Yes.  That is fair to say.

3       Q.   Did you use the information that you learned

4   from your review of the policy, your interview of the

5   insured and your review of the medical information to

6   evaluate whether or not a claim should be paid?

7       A.   Yes.

8       Q.   Did you have any dollar limit as to the amount

9   of claim that you could approve?

10      A.   Yes.

11      Q.   What was it?

12      A.   I think -- and I am not sure -- I believe it

13  may have been $4,000.

14      Q.   Okay.

15      A.   I really don't 100 percent remember.

16      Q.   And that amount, that was a monthly benefit

17  amount?

18      A.   That is correct.

19      Q.   So if a claimant were eligible for monthly

20  benefits of $4,000 and based on your review of the

21  policy and your interview and the medical information

22  and you determined that the claim should be approved,

23  you could authorize that monthly benefit?

24      A.   That is correct.

25      Q.   Now, could you authorize payment of the claim



Case 6:14-cv-00149-RBD-GJK   Document 121-2   Filed 04/17/15   Page 19 of 66 PageID 715

ANTOINETTE ELKINS                                    February 25, 2015
MONSERRATE vs. HARTFORD FIRE INSURANCE                        19

1    for multiple months?

2        A.   Yes.

3        Q.   Was there any limit on the number of months

4    that you could authorize?

5        A.   We reviewed everything at pretty much three

6    months.

7        Q.   So it was like a standard follow up?

8        A.   Yes.

9        Q.   So you could authorize a claim for $4,000 a

10   month for a three-month period?

11       A.   Yes.

12       Q.   With long-term disability claims that you

13   handled at The Hartford, what would you say the average

14   number of months was for which claims were approved?

15       A.   I am not sure what the question is.

16       Q.   Okay.  That is fine.  That is exactly what I

17   want you to do.  If you don't understand a question, let

18   me know.

19            Just based on your experience handling LTD

20   claims with The Hartford, what would be the average

21   number of months for which a claim was approved?

22       A.   Every claim was different so I couldn't say

23   what an average was.

24       Q.   Okay.  Sometimes they would go on for years,

25   though, correct?



Case 6:14-cv-00149-RBD-GJK   Document 121-2   Filed 04/17/15   Page 20 of 66 PageID 716

ANTOINETTE ELKINS                                February 25, 2015
MONSERRATE vs. HARTFORD FIRE INSURANCE                         20

 1       A.    That is correct.

 2       Q.    Did you as an LTD claims analyst 3, 4 or 5,

 3   did you deny or terminate claims?

 4       A.    Yes.

 5       Q.    And did you have the authority to do that on

 6   your own?

 7       A.    No.

 8       Q.    You had to get approval?

 9       A.    That is correct.

10       Q.    Who did you have to get approval from?

11       A.    From the team lead.

12       Q.    Did you make recommendations to your team lead

13   as to claims that should be denied or terminated?

14       A.    Yes.

15       Q.    And were your recommendations normally

16   accepted?

17       A.    Yes.

18       Q.    Did you make recommendations on the settlement

19   of claims?

20       A.    Yes.

21       Q.    And to whom did you make those

22   recommendations?

23       A.    I was a settlement specialist so I reviewed

24   files for possible settlement.

25       Q.    During 2011, 2012, 2013 and 2014, were you a



1  settlement specialist?

2       A.   Not all those years, no.

3       Q.   Which years were you a settlement specialist?

4       A.   I believe I started in 2013.

5       Q.   Okay.  In 2011 and 2012 when you were working

6  as an LTD claims analyst 3, 4 or 5 -- you are not sure

7  which one it was -- at that time before you were a

8  settlement specialist, did you make recommendations on

9  the settlement of claims?

10      A.   I would send the file through settlement

11 specialists saying that I felt it was appropriate.

12      Q.   Okay.

13      A.   I could not make the final determination.

14      Q.   But you would identify claims that you thought

15 might be appropriate for settlement?

16      A.   Yes.

17      Q.   And in those cases, did the settlement

18 specialist then get back to you?

19      A.   Yes.

20      Q.   And did they authorize you to present

21 settlements?

22      A.   Yes.

23      Q.   When they would give you that authority as a

24 claims analyst, did you then contact the claimant with a

25 proposal?



1    A.    Yes.

2    Q.    Did you do that verbally or in writing?

3    A.    Both.

4    Q.    And when you were granted that authority, were

5  you given a range or just a dollar amount?

6    A.    You were given a dollar amount with a range so

7  there was a high and a low.

8    Q.    And you would present the low?

9    A.    Yes.

10    Q.    And what would happen if the claimant rejected

11  it?

12    A.    Then we would close it out.  We were done.

13    Q.    If they rejected the proposal?

14    A.    Yes.  If they didn't want the settlement, we

15  just proceeded with the normal processing.

16    Q.    Okay.  So you didn't go back and then offer

17  the high amount?

18    A.    No.

19    Q.    Now, you said you became a settlement

20  specialist when?

21    A.    I believe it was in 2013.

22    Q.    Was that early in the year or later?

23    A.    I don't remember.

24    Q.    And did you continue to do your claims analyst

25  work at the same time that you were a settlement



 1   specialist?
 2       A.    Absolutely.
 3       Q.    And you were also a senior ability analyst at
 4   the same time you were a settlement specialist?
 5       A.    That is correct.
 6       Q.    So as a settlement specialist, did you have
 7   authority to settle claims?
 8       A.    No.
 9       Q.    Okay.  Would analysts come to you with claims
10   that they thought were appropriate for settlement?
11       A.    Yes.
12       Q.    And you would then give them a dollar amount
13   as authority to present?
14       A.    Yes.  We reviewed the information and made
15   sure everything was correct and then gave them the
16   dollar range.
17       Q.    Could you give yourself authority?
18       A.    No.
19       Q.    You had to go to another settlement
20   specialist?
21       A.    That is correct.
22       Q.    Okay.  And when you would give authority to
23   settle claims to a claims analyst, was there an amount
24   up to which you could authorize settlement?
25       A.    Yes.



Case 6:14-cv-00149-RBD-GJK   Document 121-2   Filed 04/17/15   Page 24 of 66 PageID 720

ANTOINETTE ELKINS                                          February 25, 2015
MONSERRATE vs. HARTFORD FIRE INSURANCE                              24

1       Q.   What was that?

2       A.   $100,000.

3       Q.   During 2013 and 2014, what percentage of your

4   time was spent doing the settlement specialist work?

5       A.   That would depend on how many files were

6   referred.

7       Q.   Okay.  On average, would you say that was half

8   of your job?

9       A.   No.  It was maybe 15 to 20 percent, depending

10  on the number we had.

11      Q.   And the remainder of your time would be spent

12  doing the senior ability analyst job?

13      A.   That is correct.

14      Q.   By that time in 2013 and 2014, you were a

15  senior ability analyst?

16      A.   I believe so, yes.

17      Q.   When did you first work as a claims analyst?

18      A.   For The Hartford?

19      Q.   For anybody.

20      A.   For anybody?

21      Q.   Yes.

22      A.   I started in claims in 1985.

23      Q.   Okay.  And did you go through training at that

24  time?

25      A.   Yes.



1        Q.    And who was it that gave you that training?

2        A.    I worked for a company called Hill Richards.

3   They are not even in business anymore, I don't think.

4        Q.    And the training you received, was it to

5   analyze particular types of claims?

6        A.    We did major medical claims back then.

7        Q.    At some point in time, did you have training

8   to be an LTD claims analyst?

9        A.    Yes.

10       Q.    When did you receive that training?

11       A.    In 1999 when I started with The Hartford.

12       Q.    You mean with CNA?

13       A.    Yes.

14       Q.    So you had training in 1999 by the CNA?

15       A.    Yes.

16       Q.    On how to analyze LTD claims?

17       A.    That is correct.

18       Q.    And how long was that training?

19       A.    I don't remember.

20       Q.    Was it was a week or three months or a month?

21       A.    It was probably in the range of two to three

22   weeks.

23       Q.    Was that like a classroom-type training?

24       A.    Some classroom, some on the job.

25       Q.    And when you first began working as a claims



1  analyst for The Hartford, were you an analyst 3?

2      A.   I don't recall what it was when I started.

3      Q.   In 2011 and 2012, did the claims that were

4  assigned to you as an LTD claims analyst fall into a

5  particular segment?

6      A.   Not at that time.

7      Q.   Okay.  When were claims segmented?

8      A.   Sometime in 2013 or 2014.  I don't recall the

9  exact date.

10     Q.   And as I understand it, they were segmented

11 into segment 1, 2 and 3.  Is that accurate?

12     A.   That is correct.

13     Q.   And during 2013 and 2014, were you assigned a

14 particular segment of claims?

15     A.   I was assigned segment 2.

16     Q.   And were segment 2 claims more complex than

17 segment 1 claims?

18     A.   Yes.

19     Q.   And as an LTD claims analyst in 2011 and 2012,

20 you were at a 3, 4 or 5 level?

21     A.   Yes.

22     Q.   Did the difficulty of the claims that were

23 assigned to you or to claims analysts generally increase

24 that were assigned to an analyst 2?

25     A.   No.



1       Q.   Were claims that were assigned to an analyst 4

2   more complex than those assigned to an analyst 3?

3       A.   No.

4       Q.   And were claims that were assigned to an

5   analyst 5 more complex than those assigned to a 4 or a

6   3?

7       A.   No.

8       Q.   Okay.  So what was your understanding as to

9   the difference between those titles, 3, 4 or 5?

10      A.   Experience, dollar authority and the number of

11  claims you were expected to handle.

12      Q.   And were you expected to handle more claims

13  because of your experience?

14      A.   Yes.

15      Q.   As an LTD claims analyst 3, 4 or 5, did you

16  work independently or did you have to go to your

17  supervisor frequently with questions?

18      A.   You went to your team leader as needed.

19      Q.   Okay.  Was that frequent?

20      A.   Yes.

21      Q.   Would you say daily?

22      A.   Yes.

23      Q.   And were you going to the team leader with

24  questions or about what?

25      A.   It could have been a contractual question.  It



1    could have been a question in regards to something in

2    the medical.  It could have been something you couldn't

3    read in the medical.  It could be something that the

4    claimant asked that you couldn't answer.  You would go

5    to your team leader.

6         Q.   Did you have to get approval from your team

7    leader when you would approve a claim?

8         A.   If it was over my authority, yes.

9         Q.   Okay.  If it was within your authority, you

10   could approve it without team lead approval?

11        A.   That is correct.

12        Q.   So you went to your supervisor or your team

13   lead with questions.  Was that daily, weekly?

14        A.   It was daily.

15        Q.   Okay.  And did your team lead give you formal

16   supervision on a day-to-day basis?

17        A.   Yes.

18        Q.   Did they tell you how to analyze each of your

19   claims?

20        A.   No, not each claim.

21        Q.   So they would give you input when you sought

22   input?

23        A.   That is correct.

24        Q.   Did your job as a claims analyst 3, 4 or 5 --

25   and, again, this is an LTD analyst 3, 4 or 5 that we



1   have been talking about -- do you understand?

2        A.   Yes.

3        Q.   Did those jobs require you to be an analytical

4   thinker?

5        A.   What do you mean by analytical thinker?

6        Q.   Did you have to analyze the claims?

7        A.   I am not sure.  What do you mean by analyze?

8   I am not sure.

9        Q.   Did you have to use the information that you

10  had obtained and evaluate it in order to make decisions?

11       A.   Yes.

12       Q.   Did the job require you to be detail-oriented?

13       A.   Yes.

14       Q.   Now, when you became a senior claims ability

15  analyst -- what I understand is also an LTD senior claim

16  ability analyst -- those titles were used

17  interchangeably?

18       A.   Yes, they were.

19       Q.   Were you handling LTD claims?

20       A.   Yes.

21       Q.   Let me back up.

22            When you were an LTD claims analyst 3, 4 or 5,

23  were you handling LTD claims?

24       A.   Yes.

25       Q.   Did you also handle STD claims?



 1      A.    Yes.

 2      Q.    Okay.  And in what context did you handle the

 3  STD claims?  Did you handle them because they were STD

 4  claims when you first started working on them or did you

 5  handle STD claims independent of your work as an LTD

 6  claims analyst?

 7      A.    When the STD claim reached halfway, they were

 8  transitioned to the LTD analyst.  You began the process

 9  of setting up the long-term disability claim and you

10  continued the processing of the short-term disability

11  claim until it ended.

12      Q.    Okay.

13      A.    So you did manage two.

14      Q.    Did you ever do overflow from the STD

15  department?

16      A.    Yes, we did.

17      Q.    And how frequently did that occur?

18      A.    As needed.  When they would get behind, we

19  would be asked to help.

20      Q.    And is that something that you recall being

21  monthly or quarterly?

22      A.    It could have been quarterly.

23      Q.    And when you were asked to handle the

24  overflow, approximately how many hours did you spend

25  doing that?



ANTOINETTE ELKINS                                    February 25, 2015
MONSERRATE vs. HARTFORD FIRE INSURANCE                             31

1          A.    I could not even begin to guess.

2          Q.    I mean, did it take you a whole week to cover

3     the overflow?

4          A.    I may have spent a couple of hours in a day in

5     a week because I had my own work to do in addition so I

6     was given a block and said, You need to get this done by

7     the end of the week.

8          Q.    Okay.

9          A.    However you can fit that into the schedule.

10         Q.    And that happened approximately quarterly?

11         A.    I could have been, yes.

12         Q.    Is that an accurate estimate?

13         A.    No, it is -- no.  It is not an accurate

14    estimate because I don't know exactly when it happened.

15         Q.    Quarterly?

16         A.    Or when it happened.

17         Q.    Okay.

18         A.    It happened as needed.  If they got behind, we

19    were asked to help.

20         Q.    Do you recall it being more frequent than

21    that?

22         A.    It depended on the time.  If they were

23    shorthanded, we were asked to help.  If it was a holiday

24    and a lot of people were out, we were asked to help.  If

25    there was a large volume of claims for some reason, we



Case 6:14-cv-00149-RBD-GJK   Document 121-2   Filed 04/17/15   Page 32 of 66 PageID 728

ANTOINETTE ELKINS                                    February 25, 2015
MONSERRATE vs. HARTFORD FIRE INSURANCE                          32

 1  would be asked to help.  It was just help as needed.

 2       Q.   So in a year and in particular during 2011,

 3  2012, 2013 or 2014, approximately how many times were

 4  you asked to do STD overflow?

 5       A.   I could not even begin to put a number to

 6  that.

 7       Q.   Was it six times a year?

 8       A.   I couldn't put a number.  I really don't know

 9  an exact number and I don't want to guess.

10       Q.   Okay.  So as a senior claims ability analyst

11  or an LTD senior claims ability analyst, you were

12  handling LTD claims?

13       A.   Yes.

14       Q.   And after you took that title which we are not

15  sure when it happened but it was probably during the

16  last couple of years of your employment?

17       A.   Yes.

18       Q.   Did you hold that position for the remainder

19  of your employment with The Hartford?

20       A.   Yes, I did.

21       Q.   And did your salary change when your title

22  changed?

23       A.   No, it did not.

24       Q.   Did the job change?

25       A.   Yes.



1      Q.    How did it change?

2      A.    The type of claim I was receiving changed.

3    That is when the segmentation began.

4      Q.    Okay.  So before the change in title, did you

5    receive a mix of claims?

6      A.    Yes.

7      Q.    Some that were later considered segment 1,

8    segment 2 and segment 3, you would get all three

9    segments before?

10     A.    There were no segments assigned at that time.

11     Q.    Right.

12     A.    So, yes, you got everything.

13     Q.    So you got a wide variety?

14     A.    That is correct.

15     Q.    Some that were very simple and some that were

16   very difficult?

17     A.    Yes.

18     Q.    And those that were more difficult might be

19   claims involving segmental conditions or fibromyalgia,

20   things that are a little bit more subjective, correct?

21     A.    That is correct.

22     Q.    And after segmentation, you got segment 2

23   claims, you said?

24     A.    That is correct.

25     Q.    And other than that, did your job remain the



 1   same?

 2        A.   Yes.

 3        Q.   Between January of 2011 and when you resigned

 4   your employment in September of 2014, who were your

 5   supervisors?

 6        A.   October of 2014.

 7        Q.   I am sorry.  October.

 8        A.   I think I had four possibly during that time.

 9   Sandra Roberson, Jeffrey Opoulka, Thomas McFadden and

10   Linda Walker (phonetic).

11        Q.   And were they each team leads?

12        A.   Yes.

13        Q.   From 2011 through October 2014, what days of

14   the week did you typically work?

15        A.   We were required to work Monday through

16   Friday.  I often worked on Sundays.

17        Q.   Did you work Saturdays?

18        A.   No.

19        Q.   Okay.  And how frequently did you work on

20   Sundays?

21        A.   Probably at least one to two times a month.

22        Q.   And when you would work on Sundays on average,

23   how many hours did you put in?

24        A.   Anywhere from two to four.

25        Q.   And on your normal workdays of Monday through



 1    Friday, what time did you normally start work?

 2         A.    Between 6:30 a.m. and 7:00.

 3         Q.    And on your normal workdays of Monday through

 4    Friday, what time did you normally leave work?

 5         A.    Between 5:00 and 7:00 p.m.

 6         Q.    So on average 6:00 p.m.?

 7         A.    We could say on average 6:00 p.m.

 8         Q.    Did you set your own schedule?

 9         A.    Within the hours set by the company.

10         Q.    Okay.  I understand there were certain core

11    hours during which you were supposed to be available to

12    speak with claimants and healthcare providers.

13         A.    That is correct.

14         Q.    What were the core hours?

15         A.    It was 9:00 a.m. to 3:30 p.m.

16         Q.    Beyond the core hours, did you set your own

17    hours?

18         A.    Yes.

19         Q.    And you decided if you started at 6:00 or 7:00

20    and whether you left at 4:00 or 5:00?  That was up to

21    you?

22         A.    Your team leader had expectations.  I was

23    supposed to work between 8:00 and 4:30.  That would have

24    been my eight hours.  If I chose to work before that,

25    that was up to me.  If I chose to work after that, that



Case 6:14-cv-00149-RBD-GJK   Document 121-2   Filed 04/17/15   Page 36 of 66 PageID 732

ANTOINETTE ELKINS                                    February 25, 2015
MONSERRATE vs. HARTFORD FIRE INSURANCE                          36

 1    was up to me.

 2            Anything in between those hours that I wasn't

 3    available to work, I was required to tell my team

 4    leader.

 5        Q.    And did your team lead communicate to you that

 6    you were expected to work between 8:00 and 4:30?

 7        A.    Yes.

 8        Q.    And so that would have been an eight-hour day

 9    but allowing for a half hour lunch?

10        A.    Yes.

11        Q.    And what team lead told you that you were

12    expected to work those hours?

13        A.    I don't recall specifically which one.

14        Q.    So even though core hours were 9:00 to 3:30,

15    you were told by a team lead that they wanted you there

16    between 8:00 and 4:30?

17        A.    No.  Those were the hours I chose.

18        Q.    Oh, okay.

19        A.    Those were the hours I chose to be there and

20    work.

21        Q.    Okay.

22        A.    Some people chose 9:00 and worked until 5:30.

23    Those were my hours that I chose.

24        Q.    So you chose hours that would provide for an

25    eight-hour day and a half-hour lunch?



1      A.    Yes.

2      Q.    When you arrived at work each day, did you

3   have to swipe a card to enter the building?

4      A.    I didn't work in the building.

5      Q.    You worked from home?

6      A.    That is correct.

7      Q.    Okay.  And did you work from home throughout

8   the period of 2011 through 2014?

9      A.    Yes, I did.

10      Q.    So the hours you have told me about that you

11   worked, those were hours that you put in at home?

12      A.    Yes.

13      Q.    And when you would begin work each day at

14   home, what was the first thing you would ordinarily do?

15      A.    Log on to the computer.

16      Q.    And how long did that take?

17      A.    Five minutes, maybe.

18      Q.    And then once you were logged on, you could

19   begin your work evaluating claims?

20      A.    Yes.

21      Q.    Did you take breaks during the day?

22      A.    Yes.

23      Q.    I am sure everybody takes bathroom breaks, of

24   course.

25      A.    Exactly.



1      Q.   But did you -- you know, some people will take

2   a half an hour in the morning and a half an hour in the

3   afternoon, something like that.  Did you take breaks?

4      A.   No.

5      Q.   And did you take lunch breaks?

6      A.   One time every other week.

7      Q.   And on the other days, what did you do?

8      A.   Put something in the microwave and brought it

9   back to my desk.

10     Q.   So you worked through lunch?

11     A.   Yes, I did.

12     Q.   And one time every other week, was that -- did

13  you have a particular lunch date or a get-together?

14     A.   Yes, I did.  I had to pick up my dog from the

15  groomer.

16     Q.   Okay.  And on those occasions, how long did

17  you take for lunch?

18     A.   Maybe 30 to 45 minutes.

19     Q.   On average between 2011 and 2014, how many

20  hours a week did you work?

21     A.   Between 50 and 60.

22     Q.   So on average, it would be about 55?

23     A.   I would say an average, yes.

24     Q.   And was that every week during that period?

25     A.   Unless I was on paid time off.



1      Q.    When you worked from home, did you do so

2   through a laptop that was provided you by the company?

3      A.    Yes.

4      Q.    Did you ever use a token?

5      A.    No.

6      Q.    So throughout that period of time you always

7   worked at home, you never were required to come back in

8   the office to work?

9      A.    There were times that we were asked to come

10   in.  My schedule started out as three days at home and

11   it progressed to four days at home and then progressed

12   to five days at home and then when we were asked, we

13   would go and work in the office.

14      Q.    Between 2011 and 2014 throughout that period

15   of time, were you working five days from home?

16      A.    No.  I was working four, then five, and I

17   believe it changed in 2013.

18      Q.    And during those weeks where you worked four

19   days at home and, I guess, one day in the office?

20      A.    Yes.

21      Q.    Were your average hours each week the same as

22   what you have already told us?

23      A.    Yes.

24      Q.    Between January 2011 and when your employment

25   ended, did you ever work on holidays?



Case 6:14-cv-00149-RBD-GJK   Document 121-2   Filed 04/17/15   Page 40 of 66 PageID 736

ANTOINETTE ELKINS                                          February 25, 2015
MONSERRATE vs. HARTFORD FIRE INSURANCE                              40

```
 1        A.   Yes.

 2        Q.   How often did you work on holidays?

 3        A.   When there was work to be done and I needed to

 4   get it done.

 5        Q.   Do you have any record of the days that you

 6   worked?

 7        A.   No, I do not.

 8        Q.   Or the hours that you worked?

 9        A.   No, I do not.

10        Q.   Let me show you a document that we will mark

11   as Defendant's Exhibit No. 1.

12        A.   Okay.

13             (Defendant's Exhibit No. 1 marked for

14        identification.)

15   BY MR. WORKS:

16        Q.   Do you recognize that document?

17        A.   Yes, I do.

18        Q.   Are those your answers to the Court's

19   interrogatories?

20        A.   Yes, they are.

21        Q.   And is that your signature on the last page?

22        A.   Yes, it is.

23        Q.   And it looks like you signed these in January

24   of this year, correct?

25        A.   Yes.
```



1     Q.   And before signing them, did you review them

2  for accuracy?

3     A.   Yes.

4     Q.   So everything in here is true and correct?

5     A.   Yes, it is.

6     Q.   And on the first page, it indicates that you

7  recall Linda Walker was your last supervisor?

8     A.   Yes, she was.

9     Q.   On the second page in paragraph 4 or your

10  response to question No. 4, the second bullet point

11  indicates that "Many of your duties were controlled by

12  defendant's policy and procedures."

13         Which policies and procedures did you have to

14  follow to perform your job?

15     A.   We had procedures written on how to evaluate

16  the claim.  We had procedures written on what

17  information you would need to ask for medical-wise.  We

18  had the written policy for each group to look at.

19     Q.   The insurance policy?

20     A.   Yes.

21     Q.   Okay.  Anything else?

22     A.   We had medical reference-type tools.  We had

23  nurses.

24     Q.   Okay.  The nurses are individuals you could go

25  to with questions about the medical information?



1      A.   Yes.

2      Q.   Were there other policies or procedures that

3  you had to follow?

4      A.   In regards to what?

5      Q.   Here it says that many of your duties were

6  controlled by policies and procedures.  You told me

7  about a policy on how to evaluate claims, a policy on

8  what to ask for, the insurance policy.

9      A.   Yes.

10     Q.   The medical reference book, I guess.

11     A.   There were medical references online.

12     Q.   I see.

13          Were there any other policies or procedures

14  that you had to follow to perform your job?

15     A.   I am not sure.  Like I can't specifically name

16  everything that was there for us.

17          There was a whole Internet site full of

18  policies and procedures that you could look at if you

19  needed them.

20     Q.   Did you need them?

21     A.   Yes.

22     Q.   How frequently did you refer to them?

23     A.   Probably daily.

24     Q.   Okay.  And you would use them to help you to

25  determine how to adjudicate a claim?



1          A.    Yes.  What to do next.

2          Q.    Because of your experience in the field, did

3     you pretty much know how to handle claims without

4     referring to the policies or procedures?

5          A.    Yes.  I knew from my experience what to do,

6     but in order to insure that I was right, I would refer

7     to the policies and the procedures.

8          Q.    So you would double-check what you were doing?

9          A.    Yes.

10         Q.    And these policies or procedures you were

11    referring to, were they all online or were they in a

12    booklet form?

13         A.    They were all online.

14         Q.    Were they called something?

15         A.    They were called many things.  I think the

16    last thing they were called was claims excellence.

17         Q.    Claims excellence?

18         A.    I believe that was the last thing they were

19    called.

20         Q.    In this same answer to interrogatory, it says

21    that you used form letters.

22               Do you see that?

23         A.    Yes.

24         Q.    And what form letters did you use?

25         A.    Form letters that were in the system.



1    Q.   Were those the letters you told us about

2  before that you would use when you would ask medical

3  information?

4    A.   Yes.

5    Q.   And what other form letters would you use when

6  you --

7    A.   There were acknowledgment letters.  There were

8  denial letters.  There were approval letters.  There

9  were letters to tell the claimant things were being

10  delayed.

11    Q.   And did you tailor those letters to suit each

12  claim?

13    A.   Yes.

14    Q.   And in the letters, would you tailor them to

15  explain why a claim may be granted or why it was denied?

16    A.   We didn't explain why it was approved.  We

17  would explain why it was being denied.

18    Q.   And you would have to tailor the letter

19  appropriately?

20    A.   Yes.

21    Q.   Because the reasons for denial would vary from

22  claim to claim?

23    A.   That is correct.

24    Q.   In your answer to interrogatory Number 5 on

25  page 2, you indicate that you recall your salary being



Case 6:14-cv-00149-RBD-GJK   Document 121-2   Filed 04/17/15   Page 45 of 66 PageID 741

ANTOINETTE ELKINS                                    February 25, 2015
MONSERRATE vs. HARTFORD FIRE INSURANCE                           45

1  $59,553.36 annually?

2       A.   Yes.

3       Q.   Is that an accurate amount?

4       A.   Yes.  I must have looked it up.

5       Q.   Okay.  And it appears to be specific?

6       A.   Yes.

7       Q.   And that was your salary throughout the time

8  from 2011 until your employment ended in 2014?

9       A.   Yes, it was.

10      Q.   In your answer to interrogatory Number 7 on

11  page 3, you indicated that you worked an estimated ten

12  to twenty hours of, quote, overtime every week.

13           Do you see that?

14      A.   Yes.

15      Q.   So that would be a 50- to 60-hour workweek?

16      A.   Yes.

17      Q.   On average you worked a 55-hour workweek?

18      A.   Yes.

19      Q.   If you look down further in that same answer

20  under subparagraph E, there is an overtime rate of

21  $42.95.

22      A.   Yes.

23      Q.   Do you know how that was arrived at?

24      A.   My annual salary divided by 52, divided by 40.

25      Q.   And why would you divide by 40 rather than the



1   55 hours that you worked each week?

2       A.   Because 40 hours was our normal workweek.

3       Q.   When you say it was your normal workweek --

4       A.   That was the minimum hours we were required to

5   work.

6       Q.   Okay.  So you divided by 40 and you came up

7   with that figure there?

8       A.   Yes.

9       Q.   And is that figure actually time and a half

10  your hourly rate?

11      A.   Yes, I believe so.

12      Q.   So you took your salary and divided it by 52,

13  divided it by 40 and then multiplied that number by 1.5?

14      A.   Yes.

15      Q.   Now, this estimate of the unpaid overtime

16  hours here, 3,840, that is based on the 20 hours of

17  overtime every week, correct?

18      A.   I don't remember.

19      Q.   If it is based on the 20 hours, then that

20  would be higher than the amount that you would actually

21  be due, correct?

22      A.   Yes.  If it was based on the -- I don't recall

23  what I used when I did this.

24      Q.   It would be more accurate to base it on 15

25  hours?



Case 6:14-cv-00149-RBD-GJK   Document 121-2   Filed 04/17/15   Page 47 of 66 PageID 743

ANTOINETTE ELKINS                          February 25, 2015
MONSERRATE vs. HARTFORD FIRE INSURANCE                  47

1      A.   Yes.

2      Q.   And in this answer, you are claiming you are

3  owed $164,909 times two, which would be overtime plus an

4  equal amount as liquidated damages, correct?

5      A.   Yes.

6      Q.   If you will look at your answer to

7  interrogatory Number 8 over on page 4 in the middle of

8  the page, there's a list of different positions.

9           Do you see that?

10     A.   Yes.

11     Q.   And which of those positions did you hold

12 during 2011, 2012, 2013 and 2014?

13     A.   Okay.  I am not a hundred percent sure which

14 of them were during that timeframe.

15     Q.   Okay.

16     A.   During my tenure, I was a long-term disability

17 analyst 3, a 4, a long-term disability analyst 5 and an

18 LTD segment 2 and a senior ability analyst, a claims

19 ability 3.

20     Q.   Was a claims examiner 3 the same as an LTD

21 analyst 3?

22     A.   Yes, it was.

23     Q.   A claims examiner 3 is the same as an LTD

24 ability analyst 3?

25     A.   Yes.



Case 6:14-cv-00149-RBD-GJK   Document 121-2   Filed 04/17/15   Page 48 of 66 PageID 744

ANTOINETTE ELKINS                                    February 25, 2015
MONSERRATE vs. HARTFORD FIRE INSURANCE                        48

1    Q.   So did you hold that position also, the LTD
2    ability analyst 3?
3    A.   Wait.  I am confused.  There were so many
4    titles.
5    Q.   Which of these do you recall holding between
6    2011 and 2014?
7    A.   Okay.  I can be absolutely sure that I was an
8    LTD segment 2 analyst and an LTD analyst 4 and 5 during
9    that period.  The rest of these titles kind of all run
10   together.
11   Q.   Okay.  So the ones you were certain you held
12   during that time period would be long-term disability
13   analyst 4, long-term disability analyst 5 and LTD
14   segment 2 analyst?
15   A.   Yes.  And senior ability analyst.  LTD segment
16   2 analyst is the same as long-term disability analyst 2.
17   Q.   Okay.  I am sorry.  You said a long-term --
18   A.   -- disability 2 analyst is the same thing as a
19   long-term disability analyst 2.  They are the same
20   thing, just worded differently.
21   Q.   Okay.  I thought an LTD segment 2 analyst got
22   segment 2 claims where an analyst 2 would have received
23   a mix of claims.  Am I incorrect?
24   A.   I am not 100 percent sure, honestly.
25   Q.   Okay.



 1      A.   There were so many titles.  They changed all

 2  the time.

 3           I know when I left, I was a senior ability

 4  analyst.  That I can say for sure.

 5      Q.   Would each level of the long-term disability

 6  analysts 1, 2, 3, 4 and 5 -- was the amount of analysis

 7  that was required and decision-making authority

 8  increasing?

 9      A.   Not the amount of analysis, the volume of

10  claims and your decision, your dollar authority.

11      Q.   Okay.  In your answer to interrogatory Number

12  12, do you see that you say that you were typically

13  told, quote, You knew when you were hired that this is

14  not a 40-hour a weak job?

15      A.   Yes.

16      Q.   Who told you that?

17      A.   My team leader.

18      Q.   So you understood that you were expected to do

19  or work whatever hours were required to get the job

20  done?

21      A.   Yes.

22      Q.   And that you were doing that in exchange for

23  an annual salary?

24      A.   Yes.

25      Q.   Let me show you a document we will mark as



Case 6:14-cv-00149-RBD-GJK   Document 121-2   Filed 04/17/15   Page 50 of 66 PageID 746

ANTOINETTE ELKINS                                February 25, 2015
MONSERRATE vs. HARTFORD FIRE INSURANCE                        50

 1   Defendant's Exhibit No. 2.

 2            (Defendant's Exhibit No. 2 marked for

 3       identification.)

 4   BY MR. WORKS:

 5       Q.   Do you recognize that document?

 6       A.   No.  I have never seen this.

 7       Q.   Okay.  These are attendance reports in essence

 8   listing the time that you took off for holidays or PTO

 9   during 2011, 2012 and 2013.  To the best of your

10   knowledge, do these reports accurately reflect the days

11   you took off work for PTO and holidays during those

12   years?

13       A.   I couldn't recall exactly which days I took

14   off.

15       Q.   Do you have any reason to believe that these

16   are inaccurate?

17       A.   No, I do not.  I would have put this into the

18   computer and this is what was put out.  I have never

19   seen this.

20       Q.   Did you enter put your PTO days or holidays

21   into the computer?

22       A.   PTO days, yes.

23       Q.   Would you agree with me that at weeks where

24   you took more than one PTO day and there were also

25   holidays, you did not work the 55 hours a week that you



 1  estimate as being the average number of hours that you

 2  worked?

 3      A.   I did not work that many hours.  That is

 4  correct.  I did sometimes work on scheduled PTO days.

 5      Q.   Okay.  So in weeks where there were PTO days

 6  or holidays, you may not have worked the 55-hour

 7  workweek?

 8      A.   I may not have worked the 55-hour workweek,

 9  correct.

10      Q.   And in weeks where there were multiple PTO

11  days, if you took three or four days off, it would be

12  improbable that you worked the 55 hours, right?

13      A.   Yes, that is correct.  But I would have worked

14  more than eight hours on the days that I worked.

15      Q.   Okay.  But you still wouldn't have hit the 55?

16      A.   No, likely not.

17      Q.   Let me show you a document we will mark as

18  Defendant's Exhibit No. 3.

19          (Defendant's Exhibit No. 3 marked for

20          identification.)

21  BY MR. WORKS:

22      Q.   Do you recognize that document?

23      A.   Not really.

24      Q.   This is the second amended complaint that was

25  filed on behalf of yourself and others in a lawsuit.



1              If you will turn to page 5 at the bottom of

2      the page, the very last line, there's an allegation that

3      you believe The Hartford willfully and inaccurately

4      classified you as being exempt from overtime pay even

5      though The Hartford was aware that you were non-exempt

6      and entitled to overtime pay.

7              Do you see that?

8      A.    Yes.

9      Q.    What evidence do you have that The Hartford

10     was aware you were misclassified and entitled to

11     overtime pay?

12     A.    Well, we knew that the people in California

13     were receiving overtime pay.

14     Q.    Okay.  Do you know why the people in

15     California were receiving overtime pay?

16     A.    No idea.

17     Q.    Do you know if that was because of unusual

18     state law in California?

19     A.    No, I don't.

20     Q.    Okay.  Other than your being aware of what was

21     going on in California, was there any other reason you

22     have to believe that The Hartford knew or should have

23     known that you were misclassified?

24     A.    No.

25     Q.    How did you first learn about this lawsuit?



1        A.    Through other coworkers or former coworkers.

2        Q.    Okay.  Who first told you about it?

3        A.    I don't remember.

4        Q.    Who do you first recall talking to about the

5    lawsuit?

6        A.    I don't remember.

7        Q.    Let me show you a document we will mark as

8    Defendant's Exhibit No. 5.

9             MR. BARSZCZ:  Are you on five or four?

10            MR. WORKS:  Five.

11            MR. BARSZCZ:  You had three prior.

12            MR. WORKS:  I am sorry.  This is four.

13            (Defendant's Exhibit No. 4 marked for

14       identification.)

15   BY MR. WORKS:

16       Q.    One would be your answers to interrogatories,

17   two would be the attendance reports, three would be the

18   second amended complaint and now four would be this

19   document that is before you.

20       A.    Yes.

21       Q.    Is this your consent to sue and opt into the

22   lawsuit?

23       A.    Yes, it is.

24       Q.    And is that your signature there?

25       A.    Yes, it is.



1     Q.   And it looks like you opted in, in November of

2   last year?

3     A.   Yes.

4     Q.   What is it that you are seeking to get out of

5   the lawsuit?

6     A.   For The Hartford to make right what is wrong

7   and to correct it going forward for my friends and my

8   peers that are still there.

9     Q.   Is there anything else that you want to get

10  out of the lawsuit?

11    A.   No.

12    Q.   I have no further questions.

13         MR. BARSZCZ:  I do have a few questions.

14                    CROSS EXAMINATION

15  BY MR. BARSZCZ:

16    Q.   Ma'am, as a settlement specialist in the last

17  two years you were working, as a settlement specialist,

18  how did you determine the amounts of offer as a low and

19  a high number?

20    A.   We were given access to the reserving system.

21  We put the claim number in and the date.  It gave us a

22  reserve number.  We had a form that said put the reserve

23  in and multiply it by -- and I don't remember the

24  percentage -- and that would be your low number.  Put

25  the number in and multiply it by the percentage and that



Case 6:14-cv-00149-RBD-GJK   Document 121-2   Filed 04/17/15   Page 55 of 66 PageID 751

ANTOINETTE ELKINS                                    February 25, 2015
MONSERRATE vs. HARTFORD FIRE INSURANCE                          55

1    would be the high number.  That would be given back to

2    the claims examiner.

3         Q.   How did you confirm that a case was ready or

4    ripe for settlement?

5         A.   The claims examiner did a review.  We

6    confirmed that it had been reviewed by a nurse, that the

7    determination was made that the person was disabled and

8    they were not going to improve and then we verified

9    whether or not all the financial information in the file

10   was correct, all the coding in the file was correct, the

11   salary was correct, the benefits were correct, the end

12   date of the claim was correct, the diagnosis was

13   correct, all of the financial aspects were correct in

14   the system so that the reserve amount was accurate.

15        Q.   Were any of those confirmation, verification

16   numbers something that was subjective for you to

17   determine?

18        A.   No.

19        Q.   Earlier Mr. Works asked you about your ability

20   to approve a claim within your authorization limits.  Do

21   you remember that testimony?

22        A.   Yes.

23        Q.   In order for you to approve a claim, what were

24   the different elements that you had to satisfy to make

25   such an approval?



1    A.   That they met all the definitions in the

2  policy, that the determination was that they were

3  disabled, that there was a condition that prevented them

4  from performing their own occupation.

5    Q.   So you would make sure or verify that each of

6  the conditions were met according to the policy.  Is

7  that correct?

8    A.   Yes.

9    Q.   Was any part of that subjective that you had

10  to determine?

11    A.   The medical may have been subjective, but that

12  is why we had a nurse.

13    Q.   So the subjective medical finding, was that

14  something that was made by the nurse?

15    A.   Yes.  If it was something subjective, it went

16  to a nurse.

17    Q.   Well, can you give us an example of something

18  that was not subjective that you would not send to the

19  nurse?

20    A.   A fractured leg, surgery, a broken arm.  Those

21  things were easy to determine, stage 4 cancer.

22    Q.   So obvious?

23    A.   Obvious, yes.

24    Q.   In what way were you informed or notified that

25  you needed to help with the STD overflow work?



1      A.   Team leaders or e-mails.

2      Q.   The team leader would provide an e-mail to

3  you?

4      A.   They could or they would get you together in a

5  huddle and say, We need you to help.

6      Q.   So there would not always be a documented way

7  to notify you that you needed to help out with STD work?

8      A.   No.

9      Q.   Earlier Mr. Works asked you about the more

10  subjective claims.  I think he used the example of

11  fibromyalgia.

12      A.   Yes.

13      Q.   The subjectiveness of that claim, was that

14  something for you to subjectively determine or was that

15  for the medical people to determine?

16      A.   That was for the nurse.

17      Q.   So that subjective part of the claim, what

18  part of the subjective part of the claim was inside your

19  discretion, if anything?

20      A.   Nothing.  There were certain diagnoses that

21  were subjective.  Those went to the nurses.

22      Q.   Earlier Mr. Works also talked about a more

23  complex claim?

24      A.   Yes.

25      Q.   Was that also something that came within your



 1   discretion of processing these claims or was that

 2   complexity something for someone else?

 3        A.   Before or after segmentation?

 4        Q.   Okay.  Let's take it both.

 5        A.   Before segmentation, yes.  I would refer those

 6   to the nurse.  After segmentation, I didn't receive

 7   those.

 8             MR. BARSZCZ:  Pass the witness.

 9                      REDIRECT EXAMINATION

10   BY MR. WORKS:

11        Q.   How did you identify which medical conditions

12   were subjective and, therefore, needed to go to the

13   nurse?

14        A.   There were reference tools to look at.  If it

15   was a self-reported thing where there were no medical

16   findings, those were subjective.

17        Q.    So you would have to use the reference tools

18   and your judgment to determine what needed to go to a

19   nurse and what did not need to go to a nurse?

20        A.   Yes.

21        Q.   I have nothing further.

22             MR. BARSZCZ:  I have a follow up on that last

23        question.

24                      RECROSS-EXAMINATION

25   BY MR. BARSZCZ:



1    Q.    Part of the question was:  You used your

2  judgment to determine whether to send a case to the

3  nurse or not?

4    A.    Yes.

5    Q.    Tell us what the subjective part of whether to

6  send something to the nurse or not -- and I don't want

7  to put words in your mouth -- so just go ahead and

8  elaborate on that.

9    A.    An example of the subjective claim, is that

10  what you are --

11    Q.    That you would not send to a nurse.

12    A.    That I would not send to a nurse.  If the

13  claimant fell off of a house and he broke his leg and he

14  had surgery to fix his leg and he was in a cast.  That

15  is not a subjective claim.

16    Q.    Well, give us a subjective claim that you

17  would not send to the nurse.  Or would you send all

18  subjective claims to the nurse?

19    A.    The subjective claims went to the nurse.

20    Q.    Thank you.  No additional questions.

21        MR. WORKS:  Just one follow up.

22            FURTHER REDIRECT EXAMINATION

23  BY MR. WORKS:

24    Q.    Did you make a determination as to whether

25  something was, quote, subjective and needed to go to a



ANTOINETTE ELKINS                              February 25, 2015
MONSERRATE vs. HARTFORD FIRE INSURANCE                      60

1   nurse?

2        A.   Yes.   To a point.   There were certain things

3   that went to a nurse.

4        Q.   Okay.   You had to be able to identify which

5   claims needed the input from a nurse case manager and

6   which did not?

7        A.   Yes.

8        Q.   And you did that based upon your experience?

9        A.   And some tools given that were for us in the

10  system.

11       Q.   Okay I have no further questions.

12             FURTHER RECROSS-EXAMINATION

13  BY MR. BARSZCZ:

14       Q.   If it was not obvious, did you send it to the

15  nurse?

16       A.   Yes.

17             MR. BARSZCZ:   I have no further questions.

18             MR. WORKS:   I have no further questions.

19             MR. BARSZCZ:   We will read.

20             COURT REPORTER:   Did you want to order at this

21       time?

22             MR. WORKS:   Yes, please.

23             THE VIDEOGRAPHER:   The time is 10:14 a.m., and

24       we are off the record.

25             (Witness did not waive reading.)



1    (Deposition concluded at 10:15 a.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



```
 1              C E R T I F I C A T E   O F   O A T H

 2

 3

 4   STATE OF FLORIDA  )

 5   COUNTY OF ORANGE  )

 6

 7

 8           I, CAROLYN M. OGLESBY, certify that ANTOINETTE

 9   ELKINS personally appeared before me and was duly sworn.

10

11           WITNESS my hand and official seal this 25th

12   day of February, 2015.

13

14

15

16

17                         _____
                           Carolyn M. Oglesby,
18                         Notary Public - State of Florida
                           My Commission EE141726
19                         My Commission Expires 01/07/2016

20

21

22

23

24

25
```



Case 6:14-cv-00149-RBD-GJK   Document 121-2   Filed 04/17/15   Page 63 of 66 PageID 759

ANTOINETTE ELKINS                                    February 25, 2015
MONSERRATE vs. HARTFORD FIRE INSURANCE                          63

```
 1          C E R T I F I C A T E   O F   R E P O R T E R

 2

 3   STATE OF FLORIDA    )

 4   COUNTY OF ORANGE    )

 5

 6

 7          I, CAROLYN M. OGLESBY, being a Notary Public,

 8   certify that I was authorized to and did

 9   stenographically report the deposition of said witness,

10   that the foregoing transcript is a true and complete

11   record of my stenographic notes.

12          I further certify that I am not a relative,

13   employee, attorney, or counsel to any party, nor to the

14   attorneys of said action, nor in any way interested in

15   the outcome thereof.

16

17          Dated this 25th day of February, 2015.

18

19

20          _____
            Carolyn M. Oglesby,
21          Notary Public - State of Florida
            My Commission EE141726
22          My Commission expires 01/07/2016

23

24

25
```



Case 6:14-cv-00149-RBD-GJK   Document 121-2   Filed 04/17/15   Page 64 of 66 PageID 760

ANTOINETTE ELKINS                                    February 25, 2015
MONSERRATE vs. HARTFORD FIRE INSURANCE                             64

1                        DEPOSITION ERRATA SHEET

2

3

4    Our Assignment No. 274074

5    Case Caption:        Debra Monserrate, et al., vs.
                          Hartford Fire Insurance Company.
6

7

8        DECLARATION UNDER PENALTY OF PERJURY

9          I declare under penalty of perjury

10   that I have read the entire transcript of

11   my Deposition taken in the captioned matter

12   or the same has been read to me, and

13   the same is true and accurate, save and

14   except for changes and/or corrections, if

15   any, as indicated by me on the DEPOSITION

16   ERRATA SHEET hereof, with the understanding

17   that I offer these changes as if still under

18   oath.

19         Signed on the  day of

20           , 2015.

21

22

23

24   _____
                  ANTOINETTE ELKINS
25



Case 6:14-cv-00149-RBD-GJK   Document 121-2   Filed 04/17/15   Page 65 of 66 PageID 761

ANTOINETTE ELKINS                                    February 25, 2015
MONSERRATE vs. HARTFORD FIRE INSURANCE                         65

```
 1                    DEPOSITION ERRATA SHEET

 2    Page No. _____ Line No. _____ Change to: _____

 3    _____

 4    Reason for change:_____

 5    Page No. _____ Line No. _____ Change to: _____

 6    _____

 7    Reason for change:_____

 8    Page No. _____ Line No. _____ Change to: _____

 9    _____

10    Reason for change:_____

11    Page No. _____ Line No. _____ Change to: _____

12    _____

13    Reason for change:_____

14    Page No. _____ Line No. _____ Change to: _____

15    _____

16    Reason for change:_____

17    Page No. _____ Line No. _____ Change to: _____

18    _____

19    Reason for change:_____

20    _____

21    SIGNATURE:_____DATE:_____

22

23

24    _____
                   ANTOINETTE ELKINS
25
```



```
 1                    DEPOSITION ERRATA SHEET

 2    Page No._____Line No._____Change to:_____

 3    _____

 4    Reason for change:_____

 5    _____

 6    Page No._____Line No._____Change to:_____

 7    _____

 8    Reason for change:_____

 9    _____

10    Page No. _____Line No._____Change to:_____

11    _____

12    Reason for change:_____

13    _____

14    Page No. _____Line No._____Change to:_____

15    _____

16    Reason for change:_____

17    _____

18    Page No. _____Line No._____Change to:_____

19    _____

20    Reason for change:_____

21    SIGNATURE:_____Date:_____

22

23    _____

24               ANTOINETTE ELKINS

25
```

