## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

| | |
|---|---|
| _____ ) | |
| DEBRA MONSERRATE, et al., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| HARTFORD FIRE INSURANCE ) | CASE NO. 6:14-cv-149-Orl-18GJK |
| COMPANY, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

## DEFENDANT'S MOTION FOR DECERTIFICATION

Defendant, Hartford Fire Insurance Company ("Defendant" or "Hartford"), by and through its undersigned counsel, respectfully moves this Court for an Order decertifying this conditionally certified Fair Labor Standards Act ("FLSA") collective action, because the claims asserted by the Class Representatives should not be collectively adjudicated.

### I.    Summary of the Argument.

This case is about whether various types of Hartford Analysts[1] are entitled to overtime compensation under the FLSA. The central question of liability is whether the Administrative Exemption (29 U.S.C. §213(a)(1)) exempted Plaintiffs from entitlement to overtime pay. Now, between 26 and 47 current and former Hartford employees seek to try their claims for overtime in a single trial. Each Plaintiff's claim depends on the answer to a question: Did his or her primary duty involve the exercise of discretion and independent judgment as to

_____

[1] The term "Analyst" is defined in the Court approved Notice of Consent to Join, includes specific job types and is geographically limited to the Lake Mary and Maitland Hartford offices. (Doc. 134-1 at 2 n.1). When "analyst" is used without capitalization, it refers to Hartford's insurance claim analysts generally, and not solely those listed in the Notice.

matters of importance? However, this matter is not suitable for collective adjudication for three reasons. First, the various types of jobs involved in this case must be individually examined to determine if the Administrative Exemption applies. Complicating factors include: job title, variation in claim approval authority, differences in supervisory oversight, claim complexity, locations of work performed (from home or at office), salary differences and experience on the job and in the field. These challenges are heightened due to Hartford's late 2012 change to their disability analysts job roles, "Segmentation," which changed the job responsibilities for many Plaintiffs. Next, the defenses applicable to certain Plaintiffs require individual analysis. Finally, the Plaintiffs do not have expert analysis for proof of the amount of overtime compensation potentially due to the various Plaintiffs and the lack of evidence of class-wide damages necessitates testimony by each Plaintiff. For these reasons, trying this case as a collective action is not practicable, and decertification is warranted.

## II.  **Procedural History.**

On January 29, 2014, the original Plaintiffs filed the Complaint, alleging Hartford violated the FLSA by misclassifying them, and those similarly situated, as exempt from overtime. (Doc. 1).  In April 2015, Plaintiffs filed a Motion for Conditional Certification. (Doc. 119). On July 2, 2015, based on the Eleventh Circuit's lenient standard for conditional certification, this Court entered an order granting the motion, in part. This Court conditionally certified a class of Analysts who worked at or reported to Defendant's Maitland and Lake Mary, Florida offices, finding limited interest from analysts outside of Central Florida in participating in the case. (Doc. 129 & 134-1 at 2 n.1). The Court noted that this case appeared to largely turn on whether the Plaintiffs utilized discretion and independent judgment or simply used "skill in applying well-established techniques, procedures, or specific standards." (Doc. 129 at 8 n.7).

This Court ordered that potential class members file their consents-to-join within thirty days from the day that Plaintiffs' counsel distributed the Court approved notice of the suit and that period ended August 27, 2015 ("Opt-In Period"). (Docs. 129 at 12 and 165-1). In total 26 Analysts opted in to this case during the Opt-In Period and are not bound by arbitration agreements, however, there are up to 47 Analysts that may be involved in trial.[2] As of the date of this Motion, there are still outstanding motions that will determine the set of Plaintiffs that are able to participate in this litigation. (*See* Doc. 165 (Motion to Compel Arbitration); Doc. 168 (Motion to Clarify and Expand the Class); Doc. 183 (Motion for Order to Show Cause Why Untimely Opt-Ins Should Not Be Stricken)).

III.     **Standard of Review – *Hipp* Stage Two Decertification Analysis.**

In order to maintain a collective action under the FLSA, Plaintiffs must demonstrate that they are "similarly situated." *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1219 (11th Cir. 2001); 29 U.S.C. § 216(b). The Eleventh Circuit has established a two-step process by which a district court determines whether all of the employees in a putative class are similarly situated. *Anderson v. Cagle's Inc.*, 488 F.3d 945, 952-53 (11th Cir. 2007), *cert. denied*, 553 U.S. 1093 (2008).

While first-step analysis is fairly lenient, during the second step the plaintiffs bear "a heavier burden" to establish that they are sufficiently similarly situated. *Morgan v. Family*

---

[2] Prior to the Opt-in Period, 13 plaintiffs, not bound by arbitration agreements, opted into this case. During the Opt-In Period, 25 individuals filed their notice of consents to join and one of those, Brian Donivan, subsequently withdrew his consent. (Doc. 198). Of those individuals, 11 are bound by arbitration agreements (*See,* Doc. 165). Following the close of the Opt-In Period, Plaintiffs filed an additional 10 notices of consent to join. Defendant has moved to exclude the claims of those individuals from this litigation (the "Untimely Opt-Ins"). (*See,* Doc. 183). Three of the Untimely Opt-Ins are also bound by arbitration agreements. Defendant has moved to compel arbitration as to Plaintiffs Manser and Wallang. Plaintiff Anello filed her consent to join after Defendants moved to exclude the Untimely Opt-Ins, but she is also bound by an arbitration agreement and Plaintiffs' counsel has indicated that when the Court rules on whether Plaintiffs Manser and Wallang must arbitrate their claims, she will follow the Court's directive with Plaintiff Anello.

*Dollar*, 551 F.3d 1233, 1261 (11th Cir. 2008). Typically, as is true in this case, decertification analysis takes place when the parties' discovery has been largely completed. With a near complete factual record the District Court can make a "more informed factual determination of similarity." *Morgan*, 551 F.3d at 1261. While there is no exact test to determine similarity of class members, "logically the more material distinctions revealed by the evidence, the more likely the district court is to decertify the collective action." *Anderson*, 488 F.3d at 953. In making this determination, the courts consider the following factors: (1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant that appear to be individual to each plaintiff; and (3) fairness and procedural considerations. *Morgan*, 551 F.3d at 1261-1262. Further, the similarities necessary to maintain an FLSA collective action must extend "beyond the mere facts of job duties and pay provisions." *Anderson*, 488 F.3d at 953 (quoting *White v. Osmose, Inc.*, 204 F. Supp. 2d 1309, 1314 (M.D. Ala. 2002)). Otherwise, "it is doubtful that §216(b) would further the interests of judicial economy, and it would undoubtedly present a ready opportunity for abuse." *Id.*

For purposes of establishing similarity, the third element of the Administrative Exemption to the FLSA—whether the Plaintiffs "exercise[d] discretion and independent judgment with respect to matters of significance" (29 C.F.R. §541.200(a))—is central to the analysis. Hartford contends that some Plaintiffs clearly meet this standard, for other Plaintiffs it is less clear, and in some cases Plaintiffs may meet this standard for part of their time at Hartford and not at other times. (*See also* Doc. 129 at 8 n.7).

## IV.    Factual Background.

Hartford is one of the largest insurance companies in the United States and it employs many analysts to analyze short term and long term disability insurance claims.

4

Hartford's analysts deal with claims having various levels of complexity and the Plaintiffs in this case held multiple jobs involving differing levels of independence and judgment. Generally speaking, Plaintiffs would have to consider various factors in evaluating disability claims due to a claimant's job type (including physical and mental requirements) and the medical conditions that lead to disability. Some claims were straightforward and Plaintiffs would not have to employ thoughtful consideration to determine how to approach claim analysis. Others, however, were more complex and would require significant judgment on the part of Plaintiffs to determine how to evaluate the claimed disability. Ex. "A" ¶ 3 ("Rodriguez Aff."). Accordingly, depending on the complexity of claims, experience, and ultimate disposition of a claim, Plaintiffs had various levels of independence in terms of analyzing claims.

In addition to differences between the Plaintiffs due to the various types of jobs they held, the relevant timeframe of this case includes "Segmentation," a period of restructuring Hartford's Group Benefits Claims department, which was implemented in November 2012. Segmentation changed the level of judgment and independence utilized by many of the Plaintiffs because it streamlined the disability claims process, by, among other steps, creating a triage stage of claims analysis that sorted cases by complexity. Rodriguez Aff. ¶ 4. Segmentation impacted many of the Plaintiffs in this case and in some cases increased their use of judgment and independence and in some instances decreased it. Accordingly, the factual background necessary for the similarly situated analysis must take into account the Plaintiffs jobs prior to Segmentation, and where they ended up after Segmentation.

A. **Job Types and Job Transitions Involved in This Case.**

(1) **LTD Claims Analysts.**

Prior to Segmentation in November 2012, many Plaintiffs in this case were

employed as Long Term Disability ("LTD") Claims Analysts, levels III-V.[3]  There are, however, others that have opted in to this case who held unique positions discussed in sections IV.A.(6-12) below.  Generally, LTD Claims Analysts analyzed and documented various forms of claim data, such as medical information and job functions relevant to a claimant's asserted disability.  Rodriguez Aff. ¶ 5.   Upon receiving a claim, the LTD Claims Analysts reviewed the policy to determine eligibility by analyzing the medical condition at issue along with the prescribed waiting period.  Fernandez Dep. 18:2-8; Edwards Dep. 19:17-24; Birchell Dep. 15:15-20; Craft Dep. 22:18-23.[4]  The LTD Claims Analysts would then contact the claimant to conduct an initial interview and obtain information regarding the claimant's medical condition and treating physician.  Fernandez Dep. 18:9-18; Edwards Dep. 20:17-21:9, 21:1-11; Birchell Dep. 15:21-25; Craft Dep. 23:3-10.  Based upon their review of the policy and the information obtained from the claimant and the claimant's medical providers, the LTD Claims Analysts would then determine whether a claim should be paid.  Edwards Dep. 24:18-25; Birchell Dep. 23:5-9; Craft Dep. 27:6-11.

Analysts' principal use of judgment and independence occurred in the context of determining what information was relevant to a claim; from where to gather the relevant information; and determining which Hartford personnel needed to be involved to process a claim.  Rodriguez Aff. ¶ 6.  Based on this exercise of discretion and judgment, each LTD Claims

---

[3] The following Plaintiffs held these Long Term Disability ("LTD") Claims Analyst positions: LTD Claims Analyst III (Fernandez, Harris, Faber, Felix, Hicks, Yaste, Easterwood, Delpha, Bullard, Bourne, Keith Smith, Ashcraft, Andreas-Moses, Morgan); LTD Claims Analyst IV (Edwards, Monserrate, Laura Smith, Elkins, Gilchrist, Ellington, Santa, Pastrana, Patel, Scott, LaPan); LTD Claims Analyst V (Birchell, Craft, Rudgers, Elkins, Marron, Stroud, Guiterrez, Fraher, Manser, Davis).

[4] The depositions of Plaintiffs were previously filed: Fernandez (Doc. 121-1); Elkins (Doc. 121-2); Monserrate (Doc. 121-3); Birchell (Doc. 121-4); Laura Smith (Doc. 121-5); Rudgers (Doc. 121-6); Harris (Doc. 121-7); Craft (Doc. 121-8); Edwards (Doc. 121-9); Faber (121-10). The depositions shall be cited herein by Deponent's last name and page and line designation.

Analyst had varying degrees of authority to approve claims for monthly benefits. Generally speaking, the necessary judgment to perform the job and authority to administer the job increased along with the LTD Claims Analyst number, III-V. But even within a single job category there were varying degrees of authority to approve claims for monthly benefits. For example, Plaintiffs, Fernandez, Harris, and Faber, were LTD Claims Analyst IIIs, but Fernandez's authority for approval of monthly disability payments was under $3,000, Harris' authority was between $2,500 and $5,000, and Faber's was under $2,000. Fernandez Dep. 25:17-20; Harris Dep. 31:11-20; Faber Dep. 26:25-27:1. Plaintiffs, Edwards, Monserrate, and Laura Smith, were all LTD Claims Analyst IVs, but Edwards had authority to approve claims up to $3,500, Monserrate had authority up to $5,000, and Laura Smith had $3,000 in authority. Edwards Dep. 25:1-2; Monserrate Dep. 40:25, 41:1-4; Smith Dep. 34:1-13. LTD Claims Analyst Vs had authority between $3,000 and $3,500 to approve claims. Birchell Dep. 24:10-16; Craft Dep. 28:20-24.

While claims were generally assigned on a rotating basis (all levels of analysts could receive both simple and complex claims) the distribution was structured so that higher level analysts would receive a greater number of complex claims. Smith Dep. 43:13-22. As a result, higher level analysts were required to be more detail oriented and analytical than lower level analysts based on the volume of their complex claims. *Compare* Smith Dep. 45:1-10 (stating LTD Claims Analyst IV had to answer template questions) *with* Birchell Dep. 30:18-31:6 (noting LTD Claims Analyst Vs had to carefully verify claims and be detail oriented); Craft Dep. 40:4-6 (noting need to be detail oriented). Further, the amount of supervision over their day-to-day work varied on an individual basis with some analysts working nearly independently and some with daily supervision. Fernandez Dep. 42:4-24 (noting frequent daily communication with

supervisor); Harris Dep. 39:23-40:18 (sporadic communication with supervisor); 40:1-18, Faber Dep. 34:14-17 (worked independently); Birchell Dep. 30:18-20 (no formal supervision of day-to-day work); Craft Dep. 38:3-7 (worked independently for the most part).

### (2) LTD Claims Analyst III.

The majority of the claims LTD Claims Analyst III received were simple, though that position received some complex claims. Simple claims involved those where a claimant was clearly disabled and would never return to work or those where the medical condition involved a relatively certain timeframe for which the employee would be out of work, for example, pregnancy.  *C.f.* Ex. "B" 16:22-17:2 (discussing simple claims in the context of short term disability claims, and indicating that pregnancy constituted a more basic type of claim) ("Butler Dep.").   Complex claims, on the other hand, involved conditions that had unpredictable timeframes, such as mental health problems and back injuries.

### (3) LTD Claims Analyst IV.

LTD Claim Ability Analyst IVs occupied the middle ground of claim complexity, receiving both simple and complex claims.   For example, Plaintiff Laura Smith testified:

> Q. Now, during the time that you were an LTD Claims Analyst IV, did the -- your work involve LTD claims that were more complex than those handled by Analyst III or II or I?
>
> A. As far as I know, there was no II or I. I was hired when there was only Levels III, IV, and V. So mine would have been more complex than a Level III.
>
> Q. Okay. Th[e]n, perhaps, a little less complex than a V might handle?
>
> A. That was the expectation.

(Smith Dep. 43:13-22).

### (4) LTD Claims Analyst V.

Finally, LTD Claims Analyst Vs were assigned the most complex cases. As a LTD Claims Analyst V, Plaintiff Birchell stated that she was given claims that were more subjective and required more analysis to determine the correct manner of handling a particular claim. Birchell Dep. 29:11-31:6.

### (5) Segmentation.

In November 2012, the LTD Claims Analyst III, IV, and V positions were phased out at Hartford as a part of Segmentation.[5] Rosario Dep. 18:2-16.[6] Subsequent to that time, LTD claims were handled by LTD Claim Ability Analysts, LTD Senior Claim Ability Analysts and LTD Specialty Analysts. Rosario Dep. 19:18-20:1. Segmentation included a triage step to claims distribution that resulted in higher level analysts handling complex claims almost exclusively, while lower level analysts handled simpler claims almost exclusively.

In the revised structure of claim processing, LTD Claim Ability Analysts receive basic claims ("Segment 1" claims), LTD Senior Ability Analysts receive the claims of moderate difficulty ("Segment 2" claims), and LTD Specialty Analysts receive the most complex claims ("Segment 3" claims). Rodriguez Aff. ¶ 7. This, in turn, increased the amount of judgment required for Specialty Analysts while it decreased the amount of judgment employed by lower-level analysts as they received almost no complex claims. *Id.*

Prior to segmentation, employees whose jobs would be changing participated in a skills assessment which largely determined what title and job responsibilities they would have

---

[5] Some Plaintiffs, such as Bill Faber, were on leave from Hartford, accordingly, company records show their LTD Claims Analyst position persisting past November 2012. However, these were not active positions.

[6] The deposition transcript of Roberto Rosario was filed at Doc. 195-5,6.

9

post-segmentation. Rodriguez Aff. ¶ 8. Some of the Plaintiffs in this case ended up in one of these categories, described more particularly hereafter.

### (6) LTD Claim Ability Analyst.

LTD Claim Ability Analyst was a new position, implemented in November 2012. Rosario Dep. 18:2-16, 19:18-22:1. Plaintiffs Monserrate, Laura Smith, Hicks, and Norman became LTD Claim Ability Analysts after Segmentation. Ex. "C" ¶ 6 ("Fazzino Aff.). These employees addressed the simplest claims, where a disability claimant's return to work was clearly anticipated or clearly not likely—where disability payments are either due or not due because of severe medical conditions, or simple medical and/or occupational complexity. LTD Claim Ability Analysts were responsible for planning, recommending, executing the investigation and disposition of LTD claims with limited intervention according to Hartford's policies and procedures and statutory, regulatory, and ethics requirements. Rodriguez Aff. ¶ 9.

Of the various post-Segmentation job types, this one is the least clear as to whether the Administrative Exemption applies. Further, Hartford eventually decided to reclassify the job as non-exempt and issued a remediation payment to make up for uncompensated overtime. Plaintiffs Arias, Bullard, Felix, Hicks, Monserrate, Norman, Smith (Laura), and Yaste received the remediation payments. Fazzino Aff. ¶ 7.

### (7) LTD Senior Claim Ability Analyst.

LTD Senior Claim Ability Analysts, an exempt position, handle more complex claims than LTD Claim Ability Analysts. Fazzino Aff. ¶ 8. Plaintiffs Fernandez, Elkins, Easterwood, Delpha, Stroud, Bourne, and Keith Smith became LTD Senior Claim Ability Analysts after Segmentation. Fazzino Aff. ¶ 9. While LTD Senior Claim Ability Analysts still investigated and adjudicated LTD claims, their claims reflected a greater number of return-to-

work outcome claims—this required the Senior Claim Ability Analysts to be more critical in their analysis. Rodriguez Aff. ¶ 10. Generally, assigned claims are handled independently by the LTD Senior Claim Ability Analyst with little management oversight. *Id.* The level of independence given to some analysts in this group is exhibited by Plaintiff, Elkins, who testified that she was an LTD Senior Claim Ability Analyst at the same time she was a settlement specialist. Elkins Dep. 23:3-5. During this period, Elkins could co-authorize settlements of up to $100,000.00, Elkins Dep. 23:22-24:2, which was far greater than the settlement authority possessed by other Plaintiffs.

Defendant contends that this middle-ground of judgment and independence will require more scrutiny and individualized review of each employee that held the title of LTD Senior Claim Ability Analyst than other positions.

### (8) LTD Specialty Analyst.

The LTD Specialty Analyst position, designated as exempt, was implemented in November 2012. Rosario Dep. 18:2-16, 19:18-20:1. Plaintiffs, Ellington, Gilchrist, Marron, Gutierrez, and Scott all held the position of LTD Specialty Analyst at some point during their employment with Hartford. Fazzino Aff. ¶ 10. LTD Specialty Analysts were responsible for planning, recommending, executing the investigation and disposition of claims with complex medical, occupation and financial issues. Rodriguez Aff. ¶ 11. Given the complexity of the claims, LTD Specialty Analysts were highly independent and expected to communicate with attorneys, regulatory agencies, investigators, reinsurers, beneficiaries, and medical professionals to provide background, status, reasoning and the disposition of the cases they were assigned. *Id.* LTD Specialty Analysts were required to stay current on issues impacting benefits including industry and marketplace trends, strategic direction of the organization, organizational structure

11

and leadership, team goals and internal initiatives. *Id.* As a result, candidates for this position were generally required to have a college degree and 3-5 years of relevant work experience. *Id.* This high level of independence and judgment clearly falls within the bounds of the administrative exemption.

### (9) Senior Quality Analyst.

Plaintiff Craft held the position of Senior Quality Analyst during part of her employment with Hartford. Craft Dep. 16:24-25. This position is distinguishable from all of the other Plaintiffs' jobs because it is from a different job family. The Quality Analyst job family provides quality control, result summaries, and recommendations for business process improvement. Fazzino Aff. ¶ 11. The job family's day-to-day work involves auditing, reporting, error trending analysis, procedure change recommendation, and documentation and procedure maintenance. *Id.* The Senior Quality Analyst leads quality assurance programs at all levels and complexities and acts as a liaison with external business units on matters relating to quality programs to ensure compliance. Fazzino Aff. ¶ 12.

### (10) CAR Specialty Analyst.

CAR[7] Specialty Analyst became a job title in May 2013. Fazzino Dep. 33:8-12.[8] This was an exempt position. Fazzino Aff. ¶ 13. Plaintiff Rudgers held this position during his employment with Hartford. Rudgers Dep. 24:4-14. While all the other analysts evaluated claims to determine whether or not they should be paid, CAR Specialty Analysts reviewed claims that had already been adjudicated, sometimes several years prior, in order to determine whether Hartford should continue paying disability benefits. Rudgers Dep. 27:2-8 and 29:13-23. CAR

---

[7] "CAR" stands for Continuing Ability Review.

[8] The deposition transcript of Maria Fazzino was filed at Doc. 195-1.

Specialty Analysts generally worked independently with little to no supervision.  Rudgers Dep.

50:13-25.  CAR Specialty Analysts recommended that certain claims be terminated and those

recommendations were normally accepted.  Rudgers Dep. 42:15-23.

### (11)STD Claims Analyst III.

STD Analysts analyzed claims for short term disability. Plaintiffs Barbara Butler,

Galo Patrick Flores, and Erin Norman were STD Claims Analyst IIIs during a portion of the

time between January 29, 2011 and today. Fazzino Aff. ¶ 14. Generally speaking, STD Claims

Analysts IIIs job duties and approach to analysis were not substantially different from the

equivalent long term disability Analysts.  However, because the claims they were working on

were necessarily for a shorter timeframe than long term disability claims, the short term claims,

individually, posed less potential liability to Hartford and therefore were less significant. These

analysts were classified as exempt until Segmentation, thereafter STD analysts dealing with all

levels of claim complexity were classified as non-exempt and received overtime compensation.

*Id.*

### (12) Team Lead.

Team Leads were responsible for overseeing a group of roughly six to ten

Analysts under their lead and their primary responsibility with regard to claims was verifying the

work of their team.  Fazzino Aff. ¶ 15.  Plaintiff Dianne Matheny was a Team Lead from

September 2012 to May 2013.  *Id.*  Ultimately she requested a demotion to a LTD Specialty

Analyst after Segmentation.  However, demonstrating the diversity of levels of responsibility

amongst the various Plaintiffs, Matheny was Team Lead to Plaintiff Shawn Craft in and around

2012. Craft Dep. 40:7-11.

### B. **Plaintiffs Work Schedules and Pay.**

In addition to having a wide variety of job duties and independence, the Plaintiffs in this case had varying hours and pay.  Beyond certain fixed hours when Plaintiffs were expected to be in the office, each Plaintiff was permitted to set his or her own work schedule. Fazzino Aff. ¶ 16.  These schedules varied widely among Plaintiffs.  For example, Faber testified that he typically worked from about 7:15 a.m. to 3:45 p.m. Monday through Friday, one or two Saturdays a month, and no Sundays.  Faber Dep. 35:14-24, 36:18-19, 37:23-38:2.  Whereas Edwards testified that she worked from about 7:00 a.m. to 8:00 p.m. Monday through Thursday, and some Fridays and Saturdays.  Edwards Dep. 32:12-20, 34:3-8.  Laura Smith testified that she typically worked 6:45 a.m. to 5:45 p.m. Monday through Friday, half the Saturdays a year, and a couple Sundays a quarter.  Smith Dep. 57:12-59:6.

Additionally, the number of overtime hours claimed by each Plaintiff varies widely.  For example, Harris and Monserrate claim to have worked 15 to 20 hours of overtime per week whereas Mayback, Faber and Edwards claim only 10 to 15 overtime hours per week and Rudgers claims only 5 to 10 hours.  (Docs. 72-2 No. 7;  49-1 No. 7; 49-3 No. 7; 50-2 No. 7; 49-2 No. 7; 72-3 No. 7).    Laura Smith claims to have worked 3, 6, 7.5, 10, or 15 hours of overtime per week depending on the given week and timeframe during her employment.  (Doc. 115 No. 7).  Birchell claims 10 hours of overtime per week.  (Doc. 50-3 No. 7).  Further complicating the claimed overtime hours is the fact that several of the Plaintiffs worked from home, accordingly, the factual disputes surrounding when a Plaintiff began and stopped working may be quite complex in some instances.  Ex. "D" 10:3-6 ("Scott Dep.").

Finally, the pay rates varied widely among Plaintiffs.  Fernandez had the lowest annual salary at $42,000, while Rudgers had the highest at $67,100.  Fernandez Dep. 14:7-10 and

14

Doc. 72-3 No. 5. Further, as noted above, some Plaintiffs (such as Patrick Flores and Barbara

Butler) held non-exempt positions at Hartford and were paid overtime for portions of their

employment and other Plaintiffs (Arias, Bullard, Felix, Hicks, Monserrate, Norman, Smith

(Laura), Yaste) received "remediation pay" providing them overtime compensation for some of

the time they worked. Fazzino Aff. ¶ 7.

## V.    Legal Analysis.

In deciding whether decertification is appropriate, courts consider three similarly

situated factors: (1) the disparate factual and employment settings of the individual plaintiffs; (2)

the various defenses available to Defendant that appear to be individual to each plaintiff; and (3)

fairness and procedural considerations. *Morgan*, 551 F.3d at 1261-1262. Defendant contends

that all three factors favor decertification of this case.

### A.    Disparate Factual and Employment Settings–Whether Plaintiffs are Similarly Situated.

As discussed in the Factual Background section, this case involves numerous

types of jobs and even more distinguishing circumstances.[9] Additionally, many Plaintiffs

switched jobs within the three years prior to this lawsuit, sometimes to jobs utilizing more

judgment and independence, and sometimes to jobs using less. The responsibilities and changes

over time in the Plaintiffs' jobs vary substantially and make assessing whether the Administrative

Exemption uniformly applies to the group unworkable.[10]

---

[9] In fact, Plaintiffs held more types of jobs than the ten listed in the Factual Background Section. For example, Jennifer Ashcraft was an Absence Coordinator, a job type not certified as part of the class, between January 29, 2011 and now.

[10] By way of example, Maya Felix was an LTD Claims Analyst III, LTD Sr. Claim Ability Analyst and a LTD Claim Ability Analyst; Erin Norman was an STD Claims Analyst III, LTD Claims Analyst IV, LTD Sr. Claim Ability Analyst and an LTD Claim Ability Analyst; and Nathan Rudgers was an LTD Claims Analyst V and a CAR Specialty Analyst.

"Neither the FLSA nor Eleventh Circuit case law provide a clear definition of 'similarly situated.' " *Todd v. Daewon America, Inc.* 2013 U.S. Dist. LEXIS 19093 (M.D. Fla. Feb. 13, 2013) (citing *Morgan,* 551 F.3d at 1260).  Instead, courts have recognized that the similarly situated inquiry depends on the type of violation alleged, *id.*, and how uniformly an exemption analysis could be applied to the class. *Pendlebury v. Starbucks Coffee Co.*, 518 F. Supp. 2d 1345, 1349 (S.D. Fla. 2007) (evaluating the application of the executive exemption).  In practice, assessing a violation and exemption depends on whether the job requirements and pay provisions of the class are comparable. *Morgan*, 551 F.3d at 1262-63; *see also Dybach v. State of Fla. Dept. of Corr.*, 942 F.2d 1562, 1567-68 (11th Cir. 1991). The Court in *Bradford v. CVS Pharm., Inc.*, 308 F.R.D. 696 (N.D. Ga. 2015) explained in granting a motion for decertification that a determination of whether the administrative exemption applies requires an individualized assessment and that " 'discretion and independent judgment' must be applied in the light of all the facts involved in the *particular employment situation* in which the question arises."  *Id.* at 700.  Noting that differing job duties require individualized analysis for a class of plaintiffs, the court noted it "would have to conduct a separate inquiry for each Plaintiff to determine whether the defense applies. Accordingly, the collective action mechanism is ill-suited for this case."  *Id.*

The first and second prong of the decertification analysis asks whether the relevant law, in this case the Administrative Exemption, can be applied with relative uniformity to the factual and employment settings of the class of Plaintiffs and whether the defenses available to the Defendant are unique to individual Plaintiffs.  To qualify for the Administrative Exemption, an employee must:

(1)  earn no less than $455 per week;

      (2) have as their primary duty the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and

      (3) exercise discretion and independent judgment with respect to matters of significance.

29 C.F.R. §541.200(a). No Plaintiff in this case made less than $455 a week. Fazzino Aff. ¶ 17. While the second prong of the exemption is at issue in this case, there is sufficient similarity between the Plaintiffs to make it irrelevant to decertification. It is whether the various Plaintiffs met the requirements for the third prong of this test, and for which timeframes within their employment have they done so, that should result in decertification of the class.

      Federal Regulations have characterized the exercise of discretion and independent judgment as follows: "In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." 29 C.F.R. § 541.202(a). Federal regulations recognize that insurance claims adjusters, which is essentially what most of the Plaintiffs are, typically meet the terms of the exemption. 29 C.F.R. § 541.203(a) ("Insurance claims adjusters generally meet the duties requirements [elements two and three] for the administrative exemption . . ."). However, this guideline is not determinative for all insurance adjusters—each situation requires a case-by-case analysis. *See* 69 Fed. Reg. at 22,144, 22,145 (stating that the regulation "identifies the typical duties of an exempt claims adjuster" and "there must be a case-by-case assessment to determine whether the employee's duties meet the requirement for exemption," ); *see also Hundt v. DirectSat USA, LLC*, 294 F.R.D. 101, 105 (N.D. Ill. 2013) (decertifying class because administrative exemption analysis required individualized analysis); *Hill v. R+L Carriers*, 2011 U.S. Dist. LEXIS 27997 (N.D. Ca. March 3, 2011) (granting

motion for decertification because "[t]he requirements of the administrative exemption alone evince the necessity of individualized inquiries" that would prove too unwieldy for a single collective trial).

In this case the Plaintiffs had a variety of levels of responsibility and a major restructuring of the disability claims department occurred in the middle of the relevant timeframe. Accordingly, there is no practical, uniform way to assess whether each member of the class fits within the Administrative Exemption. The reality is that it is very likely some of the Plaintiffs fit within the exemption, and less likely for others—a uniform ruling as to whether the exemption applied to the class as a whole would likely result in a windfall for some and an injustice to others.

**B. <u>Individualized Defenses Specific to Each Opt-In Preclude Collective Treatment.</u>**

**(1) <u>Defenses Generally.</u>**

The second factor considered in determining the propriety of a collective action is whether the potential defenses at issue relate to the class as a whole or will be raised with respect to certain individual plaintiffs. *Whineglass v. Smith*, No. 8:11-CV-2784-T-23TGW, 2013 U.S. Dist. LEXIS 71977, at *23 (M.D. Fla. May 3, 2013). Defendant has multiple individualized defenses that preclude collective adjudication—these defenses, at base, recognize that if Hartford should have paid overtime, then each Plaintiff's award would require individualized analysis. *See, e.g., Mathis v. Darden Rests.*, No. 12-61742-CIV-DIMITROULEAS, 2014 U.S. Dist. LEXIS 124631, at *14-15 (S.D. Fla. Sep. 1, 2014) (decertifying class due, in part, to defense involving voluntary off-the-clock work); *Zulauf v. Amerisave Mortg. Corp.*, 911 F. Supp. 2d 1266, 1275 (N.D. Ga. 2012) (individualized defense, such as lack of knowledge of off-the-clock work,

favors decertification); *Whineglass*, 2013 U.S. Dist. LEXIS 71977, at *23-24 (need for individualized analysis as to an exemption, and willfulness of violation, or good faith reliance on outside advice favored decertification).   These defenses include   the following: (1) some Plaintiffs did not work overtime; (2) some of the Plaintiffs' claims are barred by the statute of limitations; (3) some of Plaintiffs' purported overtime hours were *de minimis*; (4) some Plaintiffs were paid overtime compensation and thus their claims are moot; and (5) some of the work Plaintiffs performed was not compensable.

The success or failure of particular defenses is contingent on the distinctions between Plaintiffs' hours worked, type of work performed and amount of compensation for that work.  These inquiries cannot be generalized across the class.  This is especially true when there is no representative testimony about unpaid overtime as a whole.  *Tanner v. TPUSA, Inc.*, 2015 U.S. Dist. LEXIS 151394, at *23 (M.D. Ga. Nov. 9, 2015) (explaining that plaintiffs would have to be questioned and impeached due to lack of representative testimony of unpaid overtime, which favors decertification).  The individual defenses further highlight the distinctions between the Plaintiffs' claims and support decertification.

### (2) **Internal Legal Investigations Create Further Sub-Categories of Plaintiffs with Regard to the Issues of Willfulness and Good Faith.**

A unique aspect of this case, relevant to both the defenses and an affirmative burden on the Plaintiffs are the issues of good faith and willfulness—which will further complicate collective adjudication.  The Court is familiar with the disputes between the parties regarding attorney client privileged material.   At the base of that dispute were several memoranda created by Hartford's Law Department following internal FLSA compliance reviews.  There are two instances in which Hartford concluded that some of the jobs involved in

this case should not be classified as exempt, the company then revised job roles and in some cases converted employees from exempt to non-exempt. This first review occurred in early 2012. Following Segmentation, Hartford again analyzed its employees to ensure compliance with the FLSA. It determined that at least one of the Analyst jobs should be classified as non-exempt, including a recommendation that LTD Claim Ability Analysts be converted from exempt to non-exempt. Fazzino Aff. ¶ 18. While Hartford's counsel's recommendations on these matters are not decisive as to what the employees' classifications should be, as that is the role of the Court, the determinations raise the issues of whether Hartford was acting in good faith in reliance on advice of counsel and whether violations of the law, if any, were willful.

Assuming that any of the jobs within the class are determined to be non-exempt, these two internal investigations, undertaken to ensure compliance with the FLSA, will impact whether the violations were willful or whether they were made in good faith. These determinations, in turn, will impact the statute of limitations applicable to individual claims and whether liquidated damages are available. *See Rodriguez v. Farm Stores Grocery, Inc.*, 518 F.3d 1259, 1274 (11th Cir. 2008) ("For the willfulness issue on which the statute of limitations turns, the burden is on the employee; for the good faith issue on which liquidated damages turns, the burden is on the employer."). Because these memoranda would only cover some employees in the class, trial on this issue would involve various combinations of sub-groups of Plaintiffs, some of whom may be operating under a three year statute of limitation with others under a two year period. And liquidated damages would, likewise, have to be evaluated in sub-groups among the current class.

### C. **Plaintiffs' Lack of Expert Precludes a Fair or Procedurally Efficient Trial.**

The Court's Scheduling Order set the deadline of June 1, 2015 for Plaintiffs to

disclose an expert report.[11]  (Doc. 113 at 2).  As of the date of this Motion, Plaintiffs have not

produced an expert report or identified an expert to address the issue of class-wide damages at

trial and discovery is closed.  (Doc. 213 at 10).  Accordingly, assuming for sake of argument that

Defendant is liable, there are only two ways that Plaintiffs could even attempt to prove damages

in this case: 1) through individual testimony or documents by the Plaintiffs; or, 2) the Court

would have to attempt to extrapolate damages based on a smaller sample of the class.

       This issue was previously addressed in the Central District of California in *Batiz*

*et al. v. American Commercial Security Services*, 5:06-cv-00566, Doc. 225 (C.D. Cal. Sept. 22, 2010).

In *Batiz*, the district court decertified a class of FLSA plaintiffs, security guards, asserting unpaid

overtime.  (*Id.* at 2). The court the noted that, while it was typical to examine all similarly-situated

factors, decertification was required under the fairness and procedural consideration prong

because the plaintiffs could "no longer demonstrate class-wide damages, [and the court could]

no longer coherently manage the class in a manner that [would] not prejudice the Plaintiffs or

Defendants." (*Id.* at 8).[12]

       The *Batiz* court went on to state:

> Without evidence related to class-wide damages, the Court is left
> with two alternatives, neither of which affords sufficient relief to
> Plaintiffs or Defendants. The first alternative is for the Court to
> permit Plaintiffs to have each member of the Class testify as to
> his or her individual damages. . . . [13]
>
> Alternatively, the Court could attempt to extrapolate the amount
> of damages based on a smaller sample of the class. This would

---

[11] The Court's Amended Scheduling Order did not change this deadline. (Doc. 136).

[12] Prior to decertification, the court excluded the plaintiffs from introducing their damage expert's report
or testimony at trial because the plaintiffs failed to disclose the report until fifty-seven days after the deadline, and
less than thirty days prior to the deadline for summary judgment.

[13] While the class in *Batiz* was larger than in this case the same considerations are applicable here.

> not be appropriate either as the Court does not have the
> necessary evidence upon which to determine class-wide damages,
> and any attempts based on the limited evidence before the Court
> would inevitably "result in some Plaintiffs being prejudiced by
> underpayment on their claims as well as prejudice to
> Defendant[s], which will overpay some Plaintiffs on their claims."

*Id* at 9.

In this case, it appears that the Plaintiffs are anticipating having each member of the class present testimony on the number of uncompensated overtime hours he or she claimed to have worked. Further, because some of the Plaintiffs, such as Scott, worked at home the type of testimony and evidence relating to how many hours Plaintiffs worked will vary substantially.

This would, in effect, require trials for 26 to 47 people to be heard by a single jury, which would be required to make individual findings for each Plaintiff. The realities of coordinating that number of witnesses and addressing the individual issues of liability as well as their estimations of damages militate in favor of decertification. At best, each Plaintiff would need to provide individualized testimony about their work circumstances and how they arrived at their estimations of overtime hours worked and the nature of their jobs at Hartford for the various positions they may have held within the statute of limitation.

The Middle District of Florida has previously granted a motion for decertification of employees who had similar job duties and pay provisions, but whose "schedule[s] differed from the other [employees] and, in fact, varied from day to day for each individual [employee]," which would therefore require individual inquiries to adjudicate claims. *West v. Verizon Communications, Inc.*, 2009 U.S. Dist. LEXIS 82665, at *12 (M.D. Fla. July 29, 2009). The factual circumstances surrounding Plaintiffs' employment with Hartford are even more compelling with regard to warranting decertification. Plaintiffs' job duties are not similar

and, even assuming *arguendo* that there is some similarity, both their pay provisions and schedules varied, which requires individual inquiries to adjudicate their respective claims.

Decertification for these reasons is consistent with other FLSA decisions, such as in *Mathis*, 2014 U.S. Dist. LEXIS 124631, at *17, which was a FLSA collective action seeking overtime compensation for "off-the-clock" work, the Court decertified the class because, "[d]efendants would face all-or-nothing liability for large groups of employees, despite those employees' dissimilar working conditions. Individual Opt-In Plaintiffs would not receive recoveries based on their individual experiences. Rather, they would be grouped with other Opt-In Plaintiffs and receive either windfalls or insufficient recoveries."  A similar dilemma is presented here as illustrated by the varying degrees of overtime hours claimed to have been worked by Plaintiffs.  For example, Harris claims to have worked 2880 hours of overtime while Birchell claims to have worked but 600 hours.  (Docs. 72-2 No. 7; 50-1 No. 7). Given that there is no representative evidence that can account for material distinctions in Defendant's purported liability to individual employees or for the difference in amounts purportedly owed, continued certification is not appropriate.

If "the core of the 'similarly situated' inquiry is the question whether the issues in the case can be adjudicated collectively[,]"  *Hill v. Muscogee Cty. Sch. Dist.*, No. 4:03-CV-60 (CDL), 2005 U.S. Dist. LEXIS 35725, at *8-9 (M.D. Ga. Dec. 20, 2005), then the answer must be no, at least not without a substantial burden on the Court and jury due to individual mini-trials for each Plaintiff. "The need for such individualized inquiries contravenes the 'basic theory of judicial economy upon which the certification of collective actions is based.' "  *Whineglass*, 2013 U.S. Dist. LEXIS 71977, at *25 (quoting *West*, 2009 U.S. Dist. LEXIS 82665).

VI.    **Conclusion.**

For the reasons set forth above, Plaintiffs have not met their burden of showing that they are similarly situated. The diverse employment experience of the current set of Plaintiffs precludes a group determination as to their exempt status. As shown above, their circumstances are simply too different from each other to make the core questions answerable by common proof. Determinations as to liability would require an evaluation of each Plaintiff's job title, variation in claim approval authority, differences in supervisory oversight, assigned claim complexity, locations of work performed (from home or at office), salary differences and experience on the job and in field. Finally, even if liability were established, there is no practical way of assessing individual damages, given Plaintiffs' lack of an expert witness.

WHEREFORE, Defendant respectfully requests that this Court enter an Order granting this Motion, decertifying the conditionally certified FLSA class, dismissing the claims of the Opt-In Plaintiffs, without prejudice, and for such further relief as the Court deems just and proper.

### 3.01(G) CERTIFICATE

Pursuant to Local Rule 3.01(g), M.D. Fla., the undersigned conferred with counsel for Plaintiffs on January 27, 2016 regarding this Motion. Plaintiffs' counsel advises they object to the relief sought herein and will oppose this Motion.

DATED this 29th day of January, 2016.

Respectfully submitted,

JACKSON LEWIS P.C.
390 North Orange Avenue, Suite 1285
Post Office Box 3389
Orlando, Florida 32802-3389
Telephone:    (407) 246-8440
Facsimile:    (407) 246-8441

By:    /s/ Donald C. Works, III
       Donald C. Works, III
       Florida Bar No. 340308
       worksd@jacksonlewis.com

       Jesse I. Unruh
       Florida Bar No. 93121
       jesse.unruh@jacksonlewis.com

       David R. Golder (*Pro Hac Vice*)
       JACKSON LEWIS P.C.
       90 State House Square, 8th FL
       Hartford, CT 06103
       Telephone:    (860) 522-0404
       Facsimile:    (860) 247-1330
       golderd@jacksonlewis.com

       Attorneys for Defendant HARTFORD FIRE
       INSURANCE COMPANY

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 29th day of January, 2016, the foregoing was electronically filed with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to: Mary E. Lytle, Esquire and David Barszcz, Esquire, Lytle & Barszcz, P.A., 543 N. Wymore Road, Suite 103, Maitland, FL 32751.

/s/ Donald C. Works, III
Donald C. Works, III

4847-3604-8172, v.  9